3 A.3d 657 (2010)
416 N.J. Super. 233
In the Matter of Noel DOE, a minor.
Docket No. FG-06-23-10
Superior Court of New Jersey, Chancery Division, Cumberland County, Family Part.
Decided August 5, 2010.
*659 Mara Spiegeland, Deputy Attorney General, for New Jersey Division of Youth and Family Services (Paula Dow, Attorney General, attorney).
Nicholas Jones, Law Guardian, attorney for minor.
MENDEZ, P.J.F.P.
The novel issues to be resolved in this case involve the scope and applicability of the New Jersey Safe Haven Infant Protection Act, N.J.S.A. 30:4C-15.5 to 15.11. The initial question is whether Noel Doe,[1] an infant who was delivered and then immediately surrendered by her mother, Jane Doe, in a hospital maternity ward, qualifies as a Safe Haven Baby. The Division of Youth and Family Services (hereinafter "the Division") filed a petition on January 5, 2010, seeking to terminate the parental rights of John and Jane Doe under the New Jersey Safe Haven Infant Protection Act. Upon careful consideration of the evidence presented, as well as an analysis of the legislative intent and public policy of the statute, the court finds that Noel Doe, the infant, was properly surrendered under the Safe Haven law. For all the reasons contained in this opinion, the Division's petition for termination of the parental rights of John and Jane Doe to Noel Doe is granted.

Factual Background
The child, Noel Doe, a girl, was born on December 16, 2009, at South Jersey Regional Medical Center in Vineland, New Jersey. The mother presented herself to the hospital in labor, was admitted to the maternity ward, and gave birth there. The hospital took her name and other identifying information as a delivering mother; however, the documents provided to the court in evidence redact her name or list her as "Unknown, Doe," as upon delivering her child, Jane told the workers at the hospital that she wished to surrender *660 her baby and requested anonymity. Jane was allowed to leave her baby at the hospital under Safe Haven protection and was discharged on December 17.
A social worker interviewed Jane prior to her discharge from the hospital and recorded the results of the interview on the confidential patient information form. The form indicates that Jane only spoke Spanish, and was provided with information about the Safe Haven law in Spanish. When interviewed by the Spanish speaking social worker, who came on a referral that Jane wished to place the baby for adoption, Jane repeatedly requested complete anonymity. Jane informed the social worker that she already had one child, and that the father of Noel had disappeared and was not in contact with her. Jane stated that she could not raise another child, especially with no help, and wished to give this child up for adoption. Jane was noted to be sad, but repeatedly requested to give the child up for adoption with complete anonymity and stressed that this was her own decision. Jane requested a discharge letter stating that she had miscarried the baby so she could tell her family that, instead of telling them that she had placed the baby for adoption. The social worker informed her that the hospital could not do this, but the doctor agreed to write her a medical leave letter for six weeks of maternity leave and to keep the letter very general and vague so as not to divulge the nature of the situation.
The information sheet notes on December 18 that there was some confusion as to whether Noel qualified as a Safe Haven baby because Jane had actually given birth in the hospital and then asked for Safe Haven anonymity. The information sheet noted that at one point hospital lawyers had told staff that Jane would have to return to the hospital, receive the baby, and then either deliver the baby to a police station or the hospital emergency room, which was on the premises, in order to qualify for Safe Haven. To that end, the social worker called Jane and told her that she needed to come to the hospital right away. The social worker collected funds to send a cab to Jane's home to bring her to the hospital after Jane agreed to come back, but when the cab went to the home, no one came out. The hospital then informed the Division on December 18 that Jane had given birth in the hospital and expressed an intent to leave the child at the hospital and not return for her pursuant to the Safe Haven law. The Division worker came and took custody of the child.
Noel has been placed in a Division-approved resource home and appears to be a healthy baby. Her resource parents have expressed a wish to adopt her. The hospital has redacted Jane Doe's identifying information from their records. The Division has accepted Noel as a Safe Haven infant. No notice has been given to Jane or John Doe of any of the proceedings regarding Noel Doe. The Division is seeking guardianship of Noel Doe with a permanent plan of adoption by the current caretaker.

Legal Analysis

Safe Haven Background
N.J.S.A. 30:4C-15.7 to 15.11, otherwise known as the New Jersey Safe Haven Infant Protection Act, became law on August 7, 2000. New Jersey and several other states passed similar laws around the same time, responding to a sixty-two-percent increase in the incidence of infant abandonment between 1991 and 1998, and several high profile cases of infant abandonment in which the infants were found dead. New Jersey was the fifth state to pass such a law. New Jersey's Safe Haven law has proven quite successful. Through the end of 2009, forty-three infants had been surrendered under the law. *661 Indeed, in the twelve months before Safe Haven was passed, eight babies were found abandoned in public places; in the twelve months following Safe Haven's enactment, there were only two.[2]
The three main principles behind Safe Haven are safety for the child, anonymity, and immunity from prosecution for the biological parents. In passing the Safe Haven law, the New Jersey Legislature found that "New Jersey and the nation have experienced sorrow in the knowledge that newborn infants are sometimes abandoned in life-threatening situations and that some of these children have been harmed or have died as a consequence of their abandonment." N.J.S.A. 30:4C-15.6(a). The Legislature acknowledged that parents of unwanted infants are often under severe emotional stress and that they may need a safe way to surrender their children to prevent them from putting the infants in dangerous or life-threatening situations. N.J.S.A. 30:4C-15.6(b). The Legislature noted that "[a]nonymity, confidentiality, and freedom from prosecution may encourage the parent to leave an infant safely and save the life of the infant." N.J.S.A. 30:4C-15.6(c). The legislative findings concluded that "this legislation is worthwhile if it saves even one infant's life." N.J.S.A. 30:4C-15.6(e). These legislative findings provide this court with the backdrop to determine the legislative intent in the construction of the New Jersey Safe Haven law.

Statutory Considerations
N.J.S.A. 30:4C-15.5 to 15.11 states that a parent may deliver a child to, or arrange for someone to deliver a child to, a State, county, or local police station, or to "the emergency department of a licensed general hospital in this State." The parent or person delivering the child may remain completely anonymous, although they may be given the opportunity to fill out a questionnaire regarding medical information that may be helpful, and are immune from any criminal liability relating to the abandonment of a child in this specific manner. N.J.S.A. 30:4C-15.8 further provides that the Division shall not be required to reunify a child surrendered under N.J.S.A. 30:4C-15.7 with her biological parents, search for relatives of the child for placement purposes, or to implement any other placement requirements that give preference to relatives for placement of the child.
The Division filed a petition to terminate the parental rights of Jane and John Doe under N.J.S.A. 30:4C-15.1(b), which states,
The Division shall initiate a petition to terminate parental rights on the grounds that `the parent has abandoned the child' pursuant to subsection (e) of section 15 of P.L. 1951, c. 138 (N.J.S.A. 30:4C-15) if the following standards are met: ... (3) where the parent voluntarily delivered the child to and left the child at, or voluntarily arranged for another person to deliver the child to and leave the child at a State, county or municipal police station or at an emergency department of a licensed general hospital in this State when the child is or appears to be no more than 30 days old, without expressing an intent to return for the child, as provided in section 4 of P.L. 2000, c. 58 (N.J.S.A. 30:4C-15.7), the division shall file for termination of parental rights no later than 21 days after the day the division assumed care, custody and control of the child.
The initial question in this case is whether the child, Noel, who was born at *662 the maternity ward of the hospital and was never delivered to the emergency department of the hospital, qualifies as a Safe Haven infant. The Division and the Law Guardian are asking this court to find that Noel is a Safe Haven child. If this court finds that the surrender of Noel by her mother Jane qualifies as a Safe Haven surrender, Jane is entitled to complete anonymity and the Division can move forward to terminate her parental rights. This court finds that by requiring a filing to terminate parental rights within twenty-one days of obtaining custody, the statutory scheme contemplates an accelerated process towards a permanent placement and adoption for the child. This court further finds that under the Safe Haven statutory scheme the Division is excused from making any efforts to reunify with the parents, find the mother, search for family members for placement, or provide any services. However, the Division has an obligation to search any reports for missing children to ensure that the child has not been reported missing. N.J.S.A. 30:4C-15.7(c). The court finds that because the statute provides no guidance in addressing the father's rights, the Division has an obligation to investigate any information that may lead to the identity of the father and provide notice to the father if the information is available.
The Safe Haven statute is clear in its requirements for Safe Haven Protection. Under subsection (b), the child must be or appear to be no more than thirty days old, be left at the "emergency department of a licensed general hospital of this State," and the parent must not express a desire to return for the child. N.J.S.A. 30:4C-15.7(b). In the instant case, the child, Noel Doe, was clearly less than thirty days old when she was presented to the hospital and when Jane Doe requested Safe Haven protection; indeed, Noel was barely two days old when Jane requested Safe Haven protection. Further, Jane not only did not express an intent to return for Noel, she affirmatively stated that she wanted to surrender the child and had no intention of returning for her. Even when hospital staff, at the urging of hospital attorneys who exhibited some confusion over Noel's Safe Haven status, arranged for a cab to bring Jane back to the hospital to perform a formal Safe Haven surrender at the emergency room, Jane did not return to the hospital. She could have scarcely been more clear regarding her intent not to return for her child. Significantly, since the commencement of this litigation, Jane has made no attempt to contact the hospital, the court, or the Division.
As to the issue regarding the emergency room surrender site, statutory law provides two distinct potential routes of interpretation. On one hand, the language of the statute is clear in designating a hospital emergency room for delivery of a Safe Haven baby. However, in reading the overall statutory scheme, this court finds that the Legislature anticipated the need for a more expansive set of Safe Haven sites than hospital emergency rooms alone. Some other states who have passed Safe Haven laws have limited Safe Haven sites to hospitals alone. New Jersey, on the other hand, chose to include in the definition of Safe Haven sites police stations as well as hospitals.
Further, in interpreting statutory language, courts are in some situations free to look to the legislative intent behind the statute to determine its proper interpretation. In G.S. v. Dept. of Human Servs., Div. of Youth & Family Servs., 157 N.J. 161, 723 A.2d 612 (1999), the court noted,
The clearest indication of a statute's meaning is its plain language. Where the plain language is clear but commands *663 a result that is inconsistent with the overall statutory scheme, the court must carefully examine the Legislature's intent. The statute should be considered in light of other statutory provisions and the nature of the subject matter. The court should strive for an interpretation that gives effect to all of the statutory provisions and does not render any language inoperative, superfluous, void or insignificant. (internal citations omitted)
As discussed previously in this opinion, the Legislature was careful to provide an indication of their intent behind the passage of the Safe Haven Law. The legislative findings state that the intent was to provide mothers of unwanted infants, who may otherwise end up in dangerous or deadly circumstances, a way to safely and anonymously surrender their child without risk to the child's life or health. The Legislature unequivocally stated that their intent was to save the lives of these children.
Looking further, the court notes the existence of NJSafeHaven.org, a website established by the State pursuant to the mandate of N.J.S.A. 30:4C-15.9 to make information about Safe Haven as widely available to the public as possible. N.J.A.C. 10:133K-1.4 states that the purpose of the hotline and website are to "Provide education and information to the public to: (i) promote safe placement alternatives for newborn infants; [and] (ii) Explain procedures established by the Act..." Looking further into the website, "Hospital Protocols" state "[u]nder Safe Haven when a baby is brought to, or delivered in a hospital, the staff should ..." (emphasis added). The same page notes that hospital employees should "[e]xplain that by accepting [medical attention or social] services [the birth mother] will not give up the legal protections or anonymity guaranteed under the Safe Haven law." "Protocols," New Jersey Safe Haven Infant Protection Act Website, last visited May 3, 2010 . To a woman reading the website, this could easily lead her to believe that by delivering the baby in the hospital and accepting medical care there, she would not be required to give up the anonymity and legal protection offered by the Safe Haven law, the very protections that Jane Doe so very much wanted.
Additionally, when giving birth, a woman might first present herself to the hospital emergency room, especially if she has not received prenatal care and is under severe emotional stress. A woman who presents herself through the emergency room of a hospital and is then admitted to the maternity ward to actually give birth could very likely think that she is surrendering the baby at a hospital emergency room as mandated by the law.
For women giving birth, delivering an infant in a hospital setting, with appropriate medical care to both mother and child, is overwhelmingly a favorable public policy goal, preferable to one that would encourage mothers to give birth at home or in other circumstances, and then bring the baby to the emergency department after birth. In this instance, the court is satisfied that Jane presented herself to the hospital emergency room in labor with Noel, was admitted to the maternity ward, and gave birth there, which is precisely what a law like Safe Haven that puts a high priority on infant safety should promote. Complications during delivery could easily lead to injury or death for both the mother and the child, and in a hospital setting, staff and doctors are present to deal with these likely contingencies.
The law should not cut off its promise of anonymity and legal immunity at the maternity ward door. An interpretation of the Safe Haven law that limits so strictly *664 the definition of a Safe Haven site to a hospital emergency room discourages mothers giving birth from seeking medical care at an early stage of delivery. This cannot be a desirable public policy goal, especially given that the stated intent of the statute is to preserve the lives of these infants.
The court finds that the New Jersey Legislature, in passing Safe Haven, intended to provide the benefits of safety, anonymity, and immunity from prosecution in circumstances like these, where the mother delivers the baby in a hospital maternity ward, then clearly and unambiguously states her desire to surrender that infant anonymously and the other Safe Haven statutory requirements are met. The court finds that encouraging mothers to give birth in a hospital setting is an overwhelmingly favorable public policy. Additionally, the court finds that Jane Doe did precisely what the Legislature intended pregnant mothers with unwanted infants to do; she presented herself to the hospital, gave birth to a healthy baby in the hospital, and then clearly and unambiguously stated her desire for Safe Haven protection. To disqualify Jane Doe from these protections after she undertook the very steps at the heart of the spirit of Safe Haven would do a great disservice to the legislative intent.
In finding that Noel Doe and Jane Doe qualify for the protections of the Safe Haven law, the court is satisfied that the Division is under no requirement to notify the surrendering parent of the pending petition to terminate her parental rights. In this case as in, very likely, many Safe Haven cases, there are myriad reasons a mother may request, and indeed very much desire, the complete anonymity provided by Safe Haven. Here, for example, Jane Doe went so far as to request that the hospital provide her with paperwork stating she had a miscarriage, so she could show that to her family. This makes clear that Jane does not want her family to know that she gave birth to a live, healthy child. Sending notifications to her home that she might share with certain family members, especially given that she is a struggling single mother already, could cause her serious family consequences. Just as the law is extremely careful in terminating parental rights, the law should, when creating an anonymous way for parents to surrender those rights, be extremely careful in reneging on its promise of anonymity and immunity. This court finds that Jane made a knowing and voluntary surrender of her child under the Safe Haven law of the State of New Jersey.
A discussion of the father, John Doe's, rights is also necessary in this case. Several statutes provide guidance to the court regarding the necessity of service upon an unknown father in a Safe Haven case. N.J.S.A. 9:2-15 states that "[n]o surrender of custody by, nor termination of the parental rights of, one parent shall affect the rights of the other parent; nor may one parent act as the agent or representative of the other parent in the surrender of custody or termination of parental rights." However, N.J.S.A. 9:3-45(d) indicates that no notice is required of termination of parental rights or adoption proceedings "[i]n any case where, within 120 days of the birth of the child or prior to the date of the preliminary hearing, whichever occurs first, the identity of a birth parent cannot be determined or where the known parent of a child is unable or refuses to identify the other parent, and the court is unable from the other information before the court to identify the other parent." Further guidance is provided by N.J.S.A. 9:3-45(b)(6), which provides that notice to a potential father of adoption proceedings is *665 not required where the father has not acknowledged paternity within 120 days of the child's birth. Most notably, N.J.S.A. 30:4C-17(c) states, "[i]n any case where the identity of an absent parent cannot be determined or the known parent of a child is unable or refuses to identify the other parent, and the court is unable from the other information before the court to identify the other parent, service on that parent shall be waived by the court."
Here, Jane Doe was unwilling to identify the father of her child. She indicated only that he was no longer in contact with her and had not been for some time prior to the birth of Noel. The court is unable, on the evidence before it, to determine who John Doe might actually be. The court further notes that consistent with N.J.S.A. 9:3-45(d) and N.J.S.A. 9:3-45(b)(6), courts should wait the stated 120 day period before signing an order for termination of parental rights in these cases. The court finds that notice to John Doe of the proceedings is not required in this case under the statutory law. However, in Safe Haven cases, where the Division has information regarding the father of the surrendered child and he was not involved in the surrender of the child, the Division is required to serve him with notice of the proceedings. Because the Division has no information regarding his identity and the mother has refused to identify him, in this case the Division is under no duty to serve John Doe with notice.
Safety, anonymity, and legal immunity are the cornerstones of Safe Haven, providing an uncomplicated, safe way to surrender an unwanted to child that could otherwise be left in dangerous circumstances. If the focus is to be on allowing for and encouraging the delivery of safe, healthy infants, mothers giving birth should be encouraged, not discouraged, from seeking medical care to deliver their infant, while being allowed to maintain their anonymity. For all the reasons in this opinion, the court grants guardianship of Noel Doe to the Division so that she can obtain permanency through adoption.
NOTES
[1] The names used in this opinion are not the real names of the parties.
[2] New Jersey Safe Haven Infant Protection website, (last visited May 3, 2010) .