RECORD IMPOUNDED

 NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-1274-14T1

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

 Plaintiff-Respondent,

v.

C.M.,

 Defendant-Appellant,

and

A.T.,

 Defendant-Respondent.
______________________________________________

IN THE MATTER OF A.M., a minor.
______________________________________________

 Argued May 4, 2017 – Decided July 25, 2017

 Before Judges Lihotz, O'Connor and Whipple.

 On appeal from Superior Court of New Jersey,
 Chancery Division, Family Part, Bergen
 County, Docket No. FN-02-327-13.

 Allison C. Williams argued the cause for
 appellant C.M. (Williams Law Group, LLC,
 attorneys; C.M., on the pro se brief).
 Julie B. Colonna, Deputy Attorney General,
 argued the cause for respondent New Jersey
 Division of Child Protection and Permanency
 (Christopher S. Porrino, Attorney General,
 attorney; Andrea M. Silkowitz, Assistant
 Attorney General, of counsel; Ms. Colonna,
 on the brief).

 Sunshine, Atkins, Minassian, Tafuri,
 D'Amato, Beane & Buckner, PA, attorneys for
 respondent A.T., join in the brief of New
 Jersey Division of Child Protection and
 Permanency.

 Noel C. Devlin, Assistant Deputy Public
 Defender, argued the cause for minor (Joseph
 E. Krakora, Public Defender, Law Guardian,
 attorney; Mr. Devlin, of counsel and on the
 brief).

PER CURIAM

 In this Title Nine action, defendant C.M. (father) appeals

from the January 10, 2014 order finding he abused and neglected

his son, A.M. (Adam), ten-years of age at the time of the

subject incident, in violation of N.J.S.A. 9:6-8.21(c)(4)(b).1

Although Adam's mother, A.T. (mother), is named as a defendant,

the Division of Child Protection and Permanency (the Division)

did not allege she abused or neglected the child. The father is

also the father of M.M. (Molly or baby). Molly's mother is the

father's current wife, K.W. (stepmother).

1
 We employ the use of initials for the parties and other
family members, and a fictitious name for defendants' son, in
order to protect their privacy.
 2
 A-1274-14T1
 Specifically, as set forth in the order, following a fact-

finding hearing, the Family Part found the father

"systematically isolated the minor child, [Adam], out of an

irrational and medically unsupported fear that [Adam] would

spread germs to his baby sister, [Molly]." The father contends

the court's conclusions are not supported by the evidence. We

agree, and reverse the finding he abused and neglected Adam.

 I

 The pertinent evidence adduced at the fact-finding hearing

revealed the following. At the time of their divorce in 2007,

the parties agreed to share joint physical custody of Adam. The

father had physical custody of Adam every Wednesday from after

school until Friday morning, and every alternate weekend from

Friday evening to Sunday evening. In 2011, the father married

the stepmother; their child, Molly, was born in January 2013.

 On March 26, 2013, a counselor at Adam's school contacted

the Division advising Adam had reported he no longer wanted to

visit with his father because he confined the child to his

bedroom during parenting time. Kimberly Roberts, the Division

investigator who received the referral, interviewed Adam, the

father, the mother, the stepmother, and other family members.

 Roberts testified Adam advised that, since Molly was born,

he had been required to remain in his bedroom when in his
 3
 A-1274-14T1
father's home because his father was a "germaphobe." Adam

reported the reason he was confined to his room was his father's

concern Adam might contaminate Molly with his germs, so the

father endeavored to limit contact between Adam and Molly as

much as possible. If Adam needed anything, he was required to

ring a cow bell and his father or stepmother would respond.

 Adam claimed he ate all meals in his bedroom, as well.

Each meal was put on a tray and placed outside of his closed

bedroom door. His father then let Adam know his meal was on the

other side of the door. Adam retrieved his meals after his

father retreated a sufficient distance down the hall.

 On a few occasions, Adam was able to eat outside of his

room, but was required to sit on the opposite side of the table

so that he would not breathe on his father and spread his germs

to Molly. Although able to hold Molly on a few occasions,

generally he was permitted to touch only her feet to keep his

germs from contaminating the baby.

 Adam also complained he was required to take a shower and

put on fresh clothes when he arrived at his father's home from

school. Adam acknowledged there were times he was allowed to

leave his room to play sports with his father outside, but such

breaks were only twenty minutes in duration. If on rare

occasion he was permitted to leave his room and venture into
 4
 A-1274-14T1
other parts of the house, he was required to sit in only one

particular chair and was prohibited from touching most objects,

including doorknobs and the refrigerator. At the conclusion of

her interview, Adam stated he did not wish to return to his

father's home because, while there, he felt like a "caged

animal."

 Roberts also interviewed the father and stepmother.

According to Roberts, they confirmed Adam's allegations.

Roberts also interviewed Adam and Molly's pediatrician, who

informed Roberts the baby was healthy. However, the doctor

commented the father and stepmother were "extremely cautious"

about the baby, and at a recent appointment asked him many

questions about the measures they should implement to prevent

Molly from getting sick. The doctor informed Roberts he had

advised the parents not to expose Molly to large crowds, persons

with illnesses, or school age children who may be carrying

illnesses.

 After the investigation concluded, the Division filed a

complaint and order to show cause why it should not have care

and supervision of Adam, pursuant to N.J.S.A. 9:6-8.21 and

N.J.S.A. 30:4C-12. In April 2013, the court granted the

Division's order to show cause, and Adam's mother was granted

physical custody; the father was permitted supervised visitation
 5
 A-1274-14T1
only. In May 2013, the court entered an order stating the

supervised visits between the father and Adam were not to occur

unless the child wanted to see his father. The father has not

had visitation with Adam since June 2013.

 The Division called social worker Sean Conlon, L.C.S.W., as

its expert on child abuse and neglect. Conlon evaluated Adam in

May 2013, who told Conlon essentially what he had reported to

Roberts. Conlon testified Adam sustained "some" emotional abuse

because his father caused him to be isolated and restricted.

Conlon did not qualify or define what "some" emotional abuse

meant.

 Conlon also noted the child was disappointed his father

rejected his explanation of how he had sustained a minor injury

to his chin, shoulder, and chest during their last visit in

March 2013; required he be supervised when interacting with the

baby; was not proud of him; and cursed on occasion. We note

none of these acts is before us. The basis for the finding the

father abused and neglected Adam is he unreasonably confined the

child to his bedroom.

 Adam testified, appearing on closed circuit television. In

contrast to what Adam allegedly informed Roberts and Conlon,

significantly, Adam testified he was confined to his room only

when he was sick and for "the week after." He rang the cow bell
 6
 A-1274-14T1
only three times; once to inquire if dinner was ready and twice

to ask for water. When he was not ill, he sat at the dinner

table, although he did have to sit at the opposite end of the

table where his father sat so he would not breathe on him and

make him ill.

 Adam further testified he had to stay in his room if he did

not want to do his homework, or was otherwise being punished.

We note here the unlikelihood Adam was banished to his room as a

form of punishment if he was otherwise restricted to his room.

In addition, Adam testified he was not forbidden from touching

all doorknobs in the house, just the one to his father's and

stepmother's bedroom. However, he was sent to his room on one

occasion as punishment for touching the door to the

refrigerator.

 Adam's response to other questions revealed he was not

confined to his room. He testified when he got home from

school, he showered and changed his clothes. He then did his

homework, which he did in his room "sometimes" but "sometimes

[he] didn't." After he completed his homework, he played or

watched television. Adam did not have a television in his

bedroom, and thus had to have ventured out of his room to watch

television. Adam also stated his television privileges were

restricted if he needed to be punished. It is improbable he was
 7
 A-1274-14T1
prohibited from watching television as a form of punishment if

expected to remain in his bedroom at all times.

 In a journal Adam maintained, he wrote he was not allowed

out of his room for "1 month since beginning of 3/13/13." This

date was a Wednesday, and Adam had parenting time on this day

and on the following day. It is not disputed he was not in his

father's home again until the following Thursday, March 21,

2013, where he remained - except when at school - through

Sunday, March 24, 2013, the last time he was in his father's

home. Adam's claim he was confined to his bedroom for a month,

commencing on March 13, 2013, is clearly unfounded.

 The father's pertinent testimony was as follows. He

disputed informing Roberts that all of Adam's allegations were

accurate. The father testified the child was not confined to

his room, unless he were ill or being punished. However, Adam

was restricted from touching the baby when he was ill, or was

required to wash his hands before touching her. When Adam had a

bad cold in February, he was prohibited from opening the

refrigerator door, using the remote control, and touching the

doorknob of the nursery. The father noted Adam was defiant at

times and kissed the baby's hand when he was ill, which

concerned the father because the baby then put her hand in her

mouth.
 8
 A-1274-14T1
 It is not disputed that during his last visit to the

father's home, which commenced the evening of Thursday, March

21, 2013 and ended on Sunday, March 24, 2013, Adam was

recovering from a stomach virus. In fact, Adam had to stay home

from school on Wednesday, March 20, 2013, because he was too ill

to attend. Adam did return to school the following day,

Thursday, March 21, 2013, but was still exhibiting some

symptoms.

 Believing the child still might be contagious, the father

confined Adam to his room from the time he arrived at his home

early Thursday evening. The father also restricted Adam to his

room after school on Friday. Because confined to his bedroom,

Adam ate dinner on Thursday and Friday evening in his room, as

well. Otherwise, Adam never had any meals in his bedroom,

except on the few occasions he was sent to his room as

punishment for some transgression and had to eat in his room.

 The stepmother testified, disputing many of the statements

Roberts attributed to her. It is not necessary to address the

stepmother's testimony in depth, although we briefly summarize

that testimony the court credited and, in fact, found

corroborative of the child's testimony.

 The stepmother stated Adam became ill with a bad cold in

February 2013, and often wiped his nose with his hands and did
 9
 A-1274-14T1
not cover his mouth when he coughed. Adam's pediatrician told

the stepmother to keep the child out of the common areas of the

house and to limit his contact with common items.

 Accordingly, while he was sick, Adam was limited to using

only the telephone in his bedroom; could not kiss the baby; was

required to ask his father or stepmother to change the channel

on the television remote control; and was prohibited from

touching the refrigerator door. If he wanted food from the

refrigerator, he had to ask the stepmother or father to retrieve

what he wanted. In addition, when the stepmother's mother

visited, her mother slept on one of the two couches in the

living room; Adam was restricted from using that particular

couch.

 The court found Adam, Roberts, and Conlon's testimony

credible and credited those portions of the stepmother's

testimony we summarized. The court did not find the father

credible, even though some of his testimony was consistent with

the child's.

 On the substantive question, the court found the father

abused and neglected the child by isolating him, specifically,

by confining him to his room whether he was sick or well, and

that such isolation caused the child emotional harm. Although

not the basis for finding he abused and neglected the child, the
 10
 A-1274-14T1
court also found fault with the father for making the child take

a shower when he came home from school; forcing Adam to sit in a

seat furthest from him at the dinner table those "few" times

Adam ate a meal outside of his room; prohibiting Adam from

touching the refrigerator, the remote control, and the doorknobs

in the home; restricting the child to sitting on only one chair

in the living room; and limiting Adam's contact with the baby.

 II

 On appeal, the father asserts the following arguments for

our consideration:

 POINT I: THE EVIDENCE AT THE FACT-FINDING
 HEARING DID NOT ESTABLISH ABUSE OR NEGLECT
 BUT ACTUALLY WAS CORROBORATIVE OF C.M.'S
 DEFENSE THAT A.M. WAS NOT EMOTIONALLY ABUSED
 OR NEGLECTED.

 POINT II: THE JUDGE ERRED BY DENYING C.M.'S
 RECUSAL MOTION WHICH SOUGHT THE JUDGE'S
 RECUSAL BECAUSE SHE HELD AN IMPROPER EX
 PARTE MEETING WITH A.M. WHICH CONSTITUTED
 PREJUDICIAL ERROR.

 We defer to the factual findings of the Family Part, but

only if "supported by adequate, substantial, and credible

evidence" in the record. N.J. Div. of Youth & Family Servs. v.

R.G., 217 N.J. 527, 552 (2014). But even if a court's factual

findings are supported by adequate, substantial, and credible

evidence, we owe no special deference to the trial court's

"interpretation of the law and the legal consequences that flow
 11
 A-1274-14T1
from established facts." Manalapan Realty, L.P. v. Twp. Comm.

of Manalapan, 140 N.J. 366, 378 (1995). A reviewing court is

compelled to reverse if the trial court failed to consider all

the controlling legal principles, or reached a determination

that "could not reasonably have been reached on sufficient

credible evidence present in the record after considering the

proofs as a whole." Heinl v. Heinl, 287 N.J. Super. 337, 345

(App. Div. 1996).

 N.J.S.A. 9:6-8.21 provides:

 "Abused or neglected child" means . . . (4)
 . . . a child whose physical, mental, or
 emotional condition has been impaired or is
 in imminent danger of becoming impaired as
 the result of the failure of his parent
 . . . to exercise a minimum degree of care
 . . . (b) in providing the child with proper
 supervision or guardianship, by unreasonably
 inflicting or allowing to be inflicted harm,
 or substantial risk thereof . . . ; or by
 any other acts of a similarly serious nature
 requiring the aid of the court.

 [N.J.S.A. 9:6-8.21(c)(4)(b).]

 The case G.S. v. Dep't of Human Servs., 157 N.J. 161 (1999)

is instructive on what constitutes "a minimum degree of care":

 The phrase "minimum degree of care" denotes
 a lesser burden on the actor than a duty of
 ordinary care. If a lesser measure of care
 is required of an actor, then something more
 than ordinary negligence is required to hold
 the actor liable. The most logical higher
 measure of neglect is found in conduct that
 is grossly negligent because it is willful
 12
 A-1274-14T1
 or wanton. Therefore, we believe the phrase
 "minimum degree of care" refers to conduct
 that is grossly or wantonly negligent, but
 not necessarily intentional.

 [Id. at 178.]

"Conduct is considered willful or wanton if done with the

knowledge that injury is likely to, or probably will, result."

Ibid. "[A]ctions taken with reckless disregard for the

consequences" are encompassed within "willful or wanton"

conduct. Ibid. "Essentially, the concept of willful and wanton

misconduct implies that a person has acted with reckless

disregard for the safety of others. . . . [A] person is liable

for the foreseeable consequences of her actions, regardless of

whether she actually intended to cause injury." Id. at 179.

 Therefore, "a [parent] fails to exercise a minimum degree

of care when he or she is aware of the dangers inherent in a

situation and fails adequately to supervise the child or

recklessly creates a risk of serious injury to that child." Id.

at 181. Courts must look at "the dangers and risks associated

with the situation" when determining whether the parent failed

to exercise a minimum degree of care. Id. at 181-82.

 Here, there is evidence Adam told Roberts and Conlon he was

confined to his bedroom for the duration of his parenting time.

However, the court found credible Adam's testimony, which was

 13
 A-1274-14T1
markedly different from what he imparted to Roberts and Conlon.

Adam's testimony was he was confined to his room only when he

was ill, needed to complete his homework, or was being punished.

Other portions of his testimony exposed the fact he was not

confined at all in the manner he reported to Roberts and Conlon.

Accordingly, the court's finding the father abused and neglected

Adam because he restricted the child to his room for the

duration of his parenting time is not supported by the credible

evidence, warranting reversal.

 Certainly, what the child reported during his testimony

would not have merited a finding of abuse and neglect.

Confining a child to his bedroom because he is sick, being

disciplined, or needs to complete a task, such as homework, is

not a grossly or wantonly negligent act. The reasonableness of

restricting a child to his room for any one of these reasons is

so eminently obvious an analysis or discussion on this point is

unwarranted.

 Although the court's conclusion the father abused and

neglected the child was based upon the child's alleged

confinement during his parenting time, but for the occasional

outing to other parts of the house, the court was critical of

the father in other respects. For the sake of completeness we

briefly address these points.
 14
 A-1274-14T1
 The court chided the father for requiring Adam to shower

and change his clothes when he came home from school, and for

imposing restrictions on how he was to contact the baby and

handle various objects in the house. However, it must be borne

in mind that, during the subject three-month period, the father

and the stepmother were responsible for caring for a newborn.

There is unrefuted evidence Adam had a bad cold in February and

a stomach virus in March 2013. The father and stepmother

understandably wanted to shield the baby from these illnesses

and limit the baby's exposure to Adam.

 Moreover, corroborating the father's and stepmother's

concern, the baby's pediatrician told the new parents to keep

the baby from large crowds, persons with illnesses, and school

age children who may carry illnesses. The measures these new

parents implemented were consistent with this advice, aimed at

reducing the spreading of germs in an effort to protect the

baby. More important, none of these measures was so unduly

burdensome that it can be said the father was grossly or

wantonly negligent in his care of this child.

 Reversed.

 15
 A-1274-14T1