**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1006-14T2

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

V.S.,

    Defendant-Appellant,

and

J.R.,

    Defendant.

_____

IN THE MATTER OF M.M-C. and
J.M-R., Minors.

_____

        Submitted October 4, 2017 — Decided November 3, 2017

        Before Judges Koblitz, Manahan and Suter.

        On appeal from Superior Court of New Jersey,
        Chancery Division, Family Part, Union County,
        Docket No. FN-20-0152-13.

        Joseph E. Krakora, Public Defender, attorney
        for appellant (Mark E. Kleiman, Designated
        Counsel, on the briefs).

Christopher S. Porrino, Attorney General, attorney for respondent (Andrea M. Silkowitz, Assistant Attorney General, of counsel; Andrea M. Barilli, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Christopher A. Huling, Designated Counsel, on the brief).

PER CURIAM

V.S.,[1] appeals from a January 29, 2014 determination after a fact-finding hearing that V.S. abused or neglected her young daughters M.M-C. (Maureen), born in 2012 and J.M-R (Julie), born in 2013. She also appeals from a December 8, 2015 order denying her Rule 4:50-1 motion for relief from judgment. Although insufficient admissible evidence of harm to Julie was presented at the fact-finding hearing, we affirm based on the evidence of neglect of Maureen.

V.S. has an extensive medical history, suffering from gallstones, polycystic ovary syndrome, scoliosis and sciatica. She also had gastric bypass surgery in 2010. While V.S. was pregnant with Maureen, she was hit in the hand and neck by a drive-by shooter. Her best friend was also shot as well as her best-friend's sixteen-year-old son, who died. V.S. was prescribed various medications due to her medical conditions, which included

---

[1] Pursuant to Rule 1:38-3(d)(12), we use initials and fictitious names to protect the privacy of the family.

post-traumatic stress disorder (PTSD) caused by the shooting. She also used drugs at times without a prescription.

Unrelated to the shooting, Maureen's birth was thirty-three weeks premature. She has global developmental delays and chronic respiratory problems, requiring her to be on oxygen at all times, suctioned regularly to prevent suffocation by aspiration, and to be on a gastrostomy tube. Prior to Division involvement, Maureen was receiving physical therapy services twice a week and special-education therapy once a week. V.S. became skilled at caring for Maureen and engaged in drug treatment voluntarily.

On June 6, 2013, V.S. left fifteen-month-old Maureen in the care of an untrained former heroin addict who did not attend to the baby's medical needs. Maureen was taken to the local hospital where she was admitted to the intensive care unit. Maureen was transferred three weeks later to Children's Hospital of Philadelphia, where she remained until September 10, 2013, more than three months after her initial hospitalization. She was then transferred to another children's hospital in New Brunswick. Her stay in the hospital may have been prolonged by V.S.'s refusal to grant permission for a tracheotomy, even after being offered a consultation from a second doctor.

In September 2013, V.S. gave birth to Julie, who did not initially show withdrawal signs, although V.S. tested positive for

benzodiazepines at the birth. V.S. had not been prescribed the drug after becoming pregnant, and was told that the drug would negatively affect the fetus. As a result of V.S.'s positive test, Julie's urine and meconium, or first stool, were tested and the hospital performed a Finnegan[2] scoring every four hours. Julie's urine screen came back negative, but her meconium screen was positive for morphine and oxymorphone.

Julie's Finnegan scores varied widely over the next several days. Initially, Julie scored a two. Julie had Finnegan scores of four, then eight, then four on three occasions. She showed signs of withdrawal such as trembling and sneezing. Then, a few days later, she scored a nine twice in a row. Later that day she scored seven, six, five, and twelve. During this twenty-four-hour period, Julie had ten stools, a high number. Julie, however, was never put on morphine treatment for withdrawal. Julie's Finnegan scores lessened and she was medically cleared for discharge ten days after her birth. A defense expert testified that Julie's records presented a confusing picture, and although the fetus was undoubtedly exposed to drugs prenatally, the baby was not at "substantial" risk of harm at birth due to her mother's drug usage.

---

[2] The Division's doctor testified that a Finnegan Neonatal Abstinence Score is an assessment tool to determine whether a child is suffering from drug withdrawal.

The Family Part judge made extensive credibility and factual findings. She noted that even the defense expert opined that Julie suffered from a mild case of neonatal abstinence syndrome. The judge found by a preponderance of the evidence that V.S. abused or neglected Julie by taking drugs leading to the infant's distress at birth. The judge also found that V.S. neglected Maureen by taking illegal drugs while caring for a seriously ill baby and leaving Maureen in the care of an admitted former drug addict who had no knowledge of how to care for the medically fragile child.

After the fact-finding hearing, a Division-selected doctor evaluated V.S. psychiatrically. The doctor recommended that V.S.'s parental rights not be terminated, and opined that V.S. was properly prescribed benzodiazepine for severe PTSD and should not lose her children based on her mental health needs. As a result of this evaluation, V.S. moved to supplement the record before us, or for a remand for reconsideration under Rule 4:50-1. We granted such a remand. Upon reconsideration, the judge found that the new evaluation did not qualify as newly discovered evidence and, even if considered, did not affect her findings.

Abuse or neglect proceedings are brought pursuant to Title 9, N.J.S.A. 9:6-8.21 to -8.73. "The main goal of Title 9 is to protect children 'from acts or conditions which threaten their welfare.'" G.S. v. Dep't of Human Servs., 157 N.J. 161, 176 (1999)

(quoting <u>State v. Demarest</u>, 252 <u>N.J. Super.</u> 323, 331 (App. Div. 1991)).

The statute sets forth seven definitions of the term "abused or neglected child." <u>N.J.S.A.</u> 9:6-8.21(c). Relevant to this case, <u>N.J.S.A.</u> 9:6-8.21(c)(4)(b) states:

> "Abused or neglected child" means
>
> . . . a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, <u>to exercise a minimum degree of care</u> . . . .
>
> in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court
>
> (Emphasis added).

"The phrase 'minimum degree of care' refers to conduct that is grossly or wantonly negligent, but not necessarily intentional." <u>G.S.</u>, <u>supra</u>, 157 <u>N.J.</u> at 178. "[A] guardian fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." <u>Id.</u> at 181. "Whether a parent or guardian has failed to exercise a minimum degree of care is to be analyzed in

light of the dangers and risks associated with the situation." Id. at 181-82.

The State has the burden of proof of demonstrating "by a preponderance of the competent, material and relevant evidence the probability of present or future harm." N.J. Div. of Youth & Family Servs. v. I.Y.A., 400 N.J. Super. 77, 87 (App. Div. 2008) (quoting N.J. Div. of Youth & Family Servs. v. S.S., 372 N.J. Super. 13, 24 (App. Div. 2004), certif. denied, 182 N.J. 426 (2005)).

We accord particular deference "to fact findings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012). A trial court "has a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 293 (2007)).

V.S. disputes the judge's determination that the Division proved Julie was put at substantial risk by V.S.'s drug ingestion. V.S.'s expert opined that the infant was not put at substantial risk in spite of the positive meconium and erratic Finnegan scores. See N.J. Dept. of Youth & Family Serv. v. A.L., 213 N.J. 1 (2013)

(holding that a finding of abuse or neglect is not sustained even if the mother tested positive for drugs upon admission to the hospital and the newborn's meconium tested positive for drugs, absent a showing of actual harm, imminent danger, or a substantial risk of harm to the infant).

The doctor who testified for the Division had not prepared an expert report, although a report was required prior to expert testimony pursuant to the court's case management order. The court thus allowed the doctor to testify only as a fact witness. The doctor's testimony did not arise from her first-hand knowledge of Julie's treatment. She was not the hands-on supervisor of the treating doctors with regard to Julie, in that she disagreed on the stand with their treatment decisions, about which she was unaware at the time of treatment. She stated, "If I were there or I was called, I would have started this child on morphine . . . . My colleagues did not do that, but I would have done that." Thus, this doctor was not sufficiently involved in the treatment of V.S. or Julie to testify as a fact witness. See Carchidi v. Iavicoli, 412 N.J. Super. 374, 383 (App. Div. 2010) (finding that doctors could not proffer their testimony as fact witnesses who did not consult with or examine a patient "for the purpose of treatment or diagnosis preliminary to treatment").

If we disregard the testimony of the Division's doctor as improperly admitted into evidence, the proof that Julie was put at substantial risk of harm was weak. Thus, we cannot affirm the finding of neglect with regard to Julie.

The judge's findings regarding Maureen are not affected by V.S.'s post-trial psychiatric evaluation. "Title 9's main focus is not the 'culpability of parental conduct' but rather 'the protection of children.'" N.J. Div. of Child Prot. & Permanency v. E.D.-O., 223 N.J. 166, 178 (2015) (quoting G.S., supra, 157 N.J. at 177). "[T]he definition of child abuse and neglect contained in the civil provision 'describe[s] only the kind of "harm" to the child and not the mental state of the accused required to establish an offense.'" G.S., supra, 157 N.J. at 176 (quoting Demarest, supra, 252 N.J. Super. at 331.)).

V.S.'s psychiatric evaluation criticized the Division for its lack of understanding of the severity of V.S.'s PTSD. Leaving a young medically fragile baby alone with an untrained supervisor for an extended period of time, resulting in an extended hospitalization, represents substantial evidence to support a finding of neglect. We therefor affirm the fact-finding insofar as the judge found that V.S. neglected her daughter Maureen. Such a finding results in serious consequences. A.L., supra, 213 N.J. at 25-26. One of the consequences is a listing in the Child Abuse

Registry (Registry). N.J.S.A. 9:6-8.11. "The records may be disclosed to physicians, courts, child welfare agencies, and certain employers. N.J.S.A. 9:6-8.10a(b)(1)-(23))." E.D.-O., supra, 223 N.J. at 170, n.2.

We affirm the finding of abuse or neglect, although we affirm only with regard to Maureen. We also affirm the denial of reconsideration. If V.S.'s Registry information is no longer accurate based on our affirmance as to Maureen only, we direct the Division to make the necessary correction.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1006-14T2