723 A.2d 612

G.S., APPELLANT–RESPONDENT, v. DEPARTMENT OF HUMAN SERVICES, DIVISION OF YOUTH AND FAMILY SERVICES, RESPONDENT–APPELLANT.

Argued October 26, 1998—Decided February 17, 1999.

*Andrea M. Silkowitz*, Assistant Attorney General, argued the cause for appellant (*Peter Verniero*, Attorney General of New Jersey, attorney; *Jaynee LaVecchia*, Assistant Attorney General, of counsel).

*Stephan Siegel*, argued the cause for respondent (*Matlin and Siegel*, attorneys).

The opinion of the court was delivered by

GARIBALDI, J.

This appeal arises out of a medication overdose administered to a child by a caregiver at a facility for retarded persons. The child was hospitalized after G.S., the caregiver, failed to follow the facility's medication dispensation procedures and administered a dosage seventy-eight times the prescribed amount. Although the child recovered and the incident was, by all accounts, an accident,

the Division of Youth and Family Services (DYFS) concluded that G.S. had committed an act of child neglect within the meaning of *N.J.S.A.* 9:6–8.21. G.S. appealed the investigative finding and the Appellate Division overruled DYFS's determination, concluding that accidental injuries cannot form the basis for a finding of neglect under *N.J.S.A.* 9:6–8.21. This Court remanded for a determination of whether the finding of neglect was sustainable under *N.J.S.A.* 9:6–8.21(c)(4)(b). The Appellate Division again concluded that the finding of neglect was improper. DYFS now appeals that decision, urging us to find that accidental injuries can support a finding of neglect under *N.J.S.A.* 9:6–8.21(c)(4)(b). We agree and reverse.

## I.

The material facts are undisputed. G.S. was the Saturday Coordinator for Respite Care at the Association for Retarded Citizens (ARC). As Coordinator, G.S. solely was responsible for administering the medication brought by parents. Although G.S. is not a nurse and it is not clear whether she had prior medication training, she had been dispensing medication at ARC for over one year prior to the incident.

N.D. is an autistic, non-verbal, developmentally disabled minor who suffers from petit mal seizures, a form of epileptic disorder. On June 4, 1994, N.D.'s mother dropped him off at ARC. M.B., an ARC worker who arrived around the same time, offered to take N.D. inside. N.D.'s mother agreed and handed M.B. a bottle containing Clonidine, an anti-hyperactive drug. The mother told M.B. that it was a new medication and that she had "crushed it" already. When M.B. went inside, she immediately brought the vial to G.S. and repeated what the mother had told her.

The ARC's written policy governing medication dispensation required parents to "supply the proper dosage of medication in a properly labeled bottle." Prior to administering the medication, the Coordinator was to "check[ ] the bottle for the correct child's name, correct medication, correct dosage, correct time, and correct method."

When the time came to administer N.D.'s medication, G.S. opened the bottle. Inside she found "crushed pink pieces—not a powder, but none similarly sized." Confused about how much to administer, G.S. asked M.B. to repeat the directions. M.B. replied that the medication "was already crushed for [N.D.]." Still uncertain what that signified, G.S. read the directions on the bottle. The directions said to give one-half a pill, increasing the dosage as needed. Because the bottle did not contain any pills in whole form, G.S. did not know how big one pill was. She did not attempt to obtain clarification from N.D.'s mother or from any other source. G.S. simply assumed that the entire bottle, which contained seventy-eight pieces, was a single dose. G.S. gave N.D. the entire bottle.

N.D. fell asleep shortly after he was given his medicine, a half-hour before his usual nap time. He was in a semi-conscious state when his mother arrived at ARC to pick him up. She rushed him to the hospital upon learning that G.S. had given him the entire bottle of Clonidine.

When N.D. arrived at the hospital, he appeared "lethargic and pale." His heart rate was plummeting, although his vital signs were stable. N.D. was admitted to the Intensive Care Unit with a diagnosis of prescription medication overdose. Doctors determined that he had ingested seventy-eight times the prescribed amount. Although he suffered no permanent harm, he remained in the hospital for forty-eight hours.

The police, ARC, and DYFS's Institutional Abuse Investigation Unit (IAIU) all investigated the incident. The police determined that the incident was an "unfortunate accident" caused by "a lack of communication between [G.S.] and the mother ..." and closed their investigation. On August 3, 1994, ARC personnel notified G.S. that their investigation revealed that she had failed to follow proper medication procedure in dispensing the drug.[1] G.S. re-

---

[1] ARC suspended G.S. immediately following the incident pending completion of the investigation.

signed after being told that her employment was being terminated.

On November 7, 1994, DYFS notified G.S. that the Division's investigation concluded that her actions in administering the medication on June 4, 1994, constituted neglect within the meaning of *N.J.S.A.* 9:6–8.11. Pursuant to *N.J.S.A.* 9:6–8.10(a), the finding of neglect would be forwarded to the Central Registry.[2] G.S. appealed DYFS's investigative findings.

On appeal, G.S. argued that her conduct could not be considered neglect under *N.J.S.A.* 9:6–8.21 because her actions were accidental. Relying on criminal neglect cases, G.S. contended that a guardian must act with a willful or purposeful intent in order for his or her conduct to be characterized as child neglect. *State v. Hofford,* 169 *N.J.Super.* 377, 384, 404 *A.*2d 1231 (App.Div.1979); *State v. Burden,* 126 *N.J.Super.* 424, 427, 315 *A.*2d 43 (App.Div. 1974). Because G.S. did not intend to administer an overdose or to harm N.D., she had not committed an act of child neglect.

The Appellate Division, in an unpublished opinion, held that G.S.'s conduct could not support a finding of child neglect under *N.J.S.A.* 9:6–8.21. To support a finding of neglect under that section, the Division reasoned that the injury must be caused by "other than accidental means." Despite the "persuasive evidence [indicating] that G.S. [had] violated the [ARC's] clear mandated policies with respect to the administration of medications," the Division found no evidence that G.S.'s conduct was "other than

---

[2] *N.J.S.A.* 9:6–8.10(a) requires all information and reports of findings obtained by DYFS during the course of an investigation to be forwarded to a central registry. On written request, DYFS may release the records to individuals named in the statute, including doctors, courts, child welfare agencies,

and any person or entity mandated by statute to consider child abuse or neglect information when conducting a background check or employment-related screening of an individual ... seeking employment with an agency or organization providing services to children[.]

[*See N.J.S.A.* 9:6–8.10(a)(1)–(22).]

accidental." The Division reversed DYFS's investigative findings and ordered that the report to the Central Registry be withdrawn.

This Court remanded the case for a determination of whether the action was sustainable under *N.J.S.A.* 9:6–8.21(c)(4). *G.S. v. Department of Human Servs.*, 151 *N.J.* 67, 697 *A.*2d 541 (1997). The Appellate Division held that DYFS's action was not sustainable under *N.J.S.A.* 9:6–8.21(c)(4), and reaffirmed its conclusion that "accidentally caused injuries [should] not be treated as child abuse." We granted certification and now consider whether a finding of neglect is sustainable under *N.J.S.A.* 9:6–8.21(c)(4) when the injury to the child is accidental. 153 *N.J.* 215, 708 *A.*2d 66 (1998).

## II.

### A.

Reviewing courts should give considerable weight to an agency's interpretation of a statute the agency is charged with enforcing. Appellate courts, however, are not bound by an agency interpretation of a strictly legal issue, *Mayflower Securities Co., Inc. v. Bureau of Securities in Division of Consumer Affairs of Dept. of Law and Public Safety*, 64 *N.J.* 85, 93, 312 *A.*2d 497 (1973), when that interpretation is inaccurate or contrary to legislative objectives. *See New Jersey Guild of Hearing Aid Dispensers v. Long*, 75 *N.J.* 544, 562–63, 384 *A.*2d 795 (1978).

DYFS is the state agency responsible for the "care, custody, guardianship ... and protection of children." *N.J.S.A.* 30:4C–2(a). Its investigative responsibilities extend to any home or institutional setting, including ARC. *See N.J.S.A.* 9:6–8.11 and 8.21. Although DYFS is entrusted with the enforcement of Title 9, this appeal raises an issue of statutory interpretation, i.e. the meaning of neglect under *N.J.S.A.* 9:6–8.21(c)(4)(b). Therefore, we need not simply "rubber stamp" DYFS's construction of this provision. *New Jersey Guild of Hearing Aid Dispensers, supra*, 75 *N.J.* at 575, 384 *A.*2d 795.

## B.

Title 9 governs the adjudication of abuse and neglect proceedings. *See N.J.S.A.* 9:6–8.21 to 8.73. The purpose of Title 9 is

to provide for the protection of children under 18 years of age who have had serious injury inflicted upon them by other than accidental means. It is the intent of this legislation to assure that the lives of innocent children are immediately safeguarded from further injury and possible death and that the legal rights of such children are fully protected.

[*N.J.S.A.* 9:6–8.8, *L.* 1971, *c.* 437.]

In 1974, the Legislature passed *N.J.S.A.* 9:6–8.21. That section defines an "abused or neglected child" as

a child less than 18 years of age whose parent or guardian . . . (1) inflicts or allows to be inflicted upon such child physical injury by other than accidental means which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ; (2) creates or allows to be created a substantial or ongoing risk of physical injury to such child by other than accidental means which would be likely to cause death or serious or protracted disfigurement, or protracted loss or impairment of the function of any bodily organ; . . . (4) or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent or guardian, as herein defined, *to exercise a minimum degree of care* . . . (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court . . . .

[*N.J.S.A.* 9:6–8.21(c)(1)–(4) (emphasis added.)

The term "guardian" is defined as "[an] employee or volunteer, whether compensated or uncompensated, of an institution who is responsible for the child's welfare and any other staff person of an institution regardless of whether or not the person is responsible for the care or supervision of the child." *N.J.S.A.* 9:6–8.21(a).

No one disputes that G.S. is a guardian within the meaning of *N.J.S.A.* 9:6–8.21(a). Nor does anyone dispute that N.D.'s "physical condition" was "impaired" by the over-medication. The question is whether G.S.'s accidental administration of seventy-eight times the prescribed dosage of Clonidine constituted a failure "to exercise a minimum degree of care . . . in providing [N.D.] with proper supervision or guardianship, by unreasonably inflicting or

allowing to be inflicted harm, or substantial risk thereof ..." thereby rendering N.D. a neglected child under *N.J.S.A.* 9:6–8.21(c)(4)(b).

### III.

The clearest indication of a statute's meaning is its plain language. *State v. Sutton*, 132 *N.J.* 471, 479, 625 *A.*2d 1132 (1993). Where the plain language is clear but commands a result that is inconsistent with the overall statutory scheme, the court must carefully examine the Legislature's intent. *Chase Manhattan Bank v. Josephson*, 135 *N.J.* 209, 225, 638 *A.*2d 1301 (1994). The statute should be considered in light of other statutory provisions and the nature of the subject matter. *State v. Brown*, 22 *N.J.* 405, 415, 126 *A.*2d 161 (1956). The court should strive for an interpretation that gives effect to all of the statutory provisions and does not render any language inoperative, superfluous, void or insignificant. *State v. Reynolds*, 124 *N.J.* 559, 564, 592 *A.*2d 194 (1991).

In this case, the Appellate Division concluded that accidentally-caused injuries cannot form the basis for a finding of neglect under *N.J.S.A.* 9:6–8.21(c)(4)(b). Reading *N.J.S.A.* 9:6–8.21 as a whole, the Appellate Division reasoned that "[i]n *N.J.S.A.* 9:6–8.21(c)(1) and (2), the Legislature displayed an intention in the clearest terms that parents or guardians who inflict ... physical injury, or cause the risk of [injury], by accidental means should not be stigmatized with the label of child neglect." Treating accidentally-caused injuries as neglect under *N.J.S.A.* 9:6–8.21(c)(4)(b) would "undo the legislative mandate" expressed in sections (1) and (2). The Appellate Division read the phrase "other than accidental means" into section (c)(4)(b) to give the statute what, in its view, was a consistent reading. According to the Appellate Division, while "[t]he accident which befell N.D. .... may well cause a serious question as to whether G.S. should be dispensing drugs[,]" DYFS's interpretation would classify a mere act of negligence as neglect. That result would abrogate the

legislative directive to protect children injured by "other than accidental means."

In concluding that accidental injuries cannot form the basis for a finding of neglect, the Appellate Division ignored the plain language of section (c)(4)(b) and erroneously interpreted the meaning of the phrase "other than accidental means." Nothing in the plain language of *N.J.S.A.* 9:6–8.21(c)(4)(b) compels the conclusion that accidental injuries cannot form the basis for a finding of neglect under that provision. The clear and unambiguous language of *N.J.S.A.* 9:6–8.21(c)(4)(b) makes no reference to the accidental or non-accidental nature of the injury. "[W]here the Legislature has carefully employed a term in one place and excluded it in another, it should not be implied where excluded." *Alan J. Cornblatt, P.A. v. Barow,* 153 *N.J.* 218, 234, 708 *A.*2d 401 (1998). Had the Legislature intended section (c)(4)(b) to be limited to "injuries caused by other than accidental means," it would have said so explicitly, as it did in the other two sections. A simple reading of *N.J.S.A.* 9:6–8.21(c)(4)(b) supports the conclusion that accidentally-caused injuries can form the basis for a finding of neglect under that section.

Even if we were to read the statement of legislative purpose contained in *N.J.S.A.* 9:6–8.8 as an overlay to Title 9, and apply the phrase "other than accidental means" to the entire Title, we nonetheless would conclude that the conduct of G.S. supports a finding of neglect under *N.J.S.A.* 9:6–8.21(c)(4)(b). *See N.J.S.A.* 9:6–8.8 (stating purpose of Title 9 is to protect children injured by "other than accidental means"). The Appellate Division equated the phrase "other than accidental means" with intent and thereby concluded that when a guardian's conduct causes an unintentional injury to a child, the guardian has injured the child through accidental means. That interpretation conflates "accidental means" and conduct resulting in accidental injury. If the Legislature were referring only to intentionally caused injuries it would have said so explicitly. We must assume that the Legislature purposefully employed the phrase "other than accidental means"

to capture a broader range of conduct. *See Croswell v. Shenouda,* 275 *N.J.Super.* 614, 620, 646 *A.2d* 1140 (Ch.Div.1994) (assuming that Legislature is familiar with rules of diction and grammar).

Although this Court has not had the opportunity to consider the meaning of the phrase "accidental means" in the child welfare context, we have interpreted the phrase numerous times in insurance law opinions.[3] An examination of the seminal case of *Linden Motor Freight Co., Inc. v. Travelers Insurance Co.,* 40 *N.J.* 511, 193 *A.2d* 217 (1963) provides useful guidance here.[4] In *Linden,* this Court drew a distinction between injuries caused by accidental means and injuries where the result was accidental. *Id.* at 524–29, 535, 193 *A.2d* 217. We concluded that the phrase "accidental means," as contained in a life insurance policy, referred to the events leading up to the injury and not the resulting injury itself. *Ibid.* (finding injury not caused by accidental means where decedent had heart attack after intentionally picking up cartons); *see United States Mutual Accident Ass'n. v. Barry,* 131 *U.S.* 100, 9 *S.Ct.* 755, 33 *L.Ed.* 60 (1889)(distinguishing between accidental means and accidental results).

In distinguishing between the means and the resulting harm, we reasoned that the term "means" refers to the cause of the injury. *Linden, supra,* 40 *N.J.* at 526, 193 *A.2d* 217. The term "accidental" refers to something unforeseen, unexpected or unusual. *Id.* at 525, 193 *A.2d* 217. Putting those phrases together, we stated that when there is something "unforeseen, unexpected, or unusual in the circumstances ... preceding [the] events," that injury has occurred by accidental means. *Id.* at 526, 193 *A.2d* 217; *Perrine*

---

[3] See *Linden Motor Freight Co., Inc. v. Travelers Insurance Co.,* 40 *N.J.* 511, 193 *A.2d* 217 (1963), for a complete discussion of cases interpreting the phrase "other than accidental means."

[4] We have previously recognized that the analytical concepts employed in insurance cases are similar to those involved in "guardian and ward" cases. *See Linden, supra,* 40 *N.J.* at 521, 193 *A.2d* 217. For that reason, we ascribe the same meaning to the phrase "accidental means" in both the child welfare and insurance law contexts.

*v. Prudential Insurance Co. of America*, 56 *N.J.* 120, 124–26, 265 *A.*2d 521 (1970). But, "[w]hen the act which produced the unforeseen result was done exactly as intended and there was nothing unusual about it other than the result itself, only the result was accidental ... [the injury] was not effected by accidental means." *Linden, supra*, 40 *N.J.* at 529, 193 *A.*2d 217. *See also Wiley v. Travelers Ins. Co.*, 119 *N.J.L.* 22, 194 *A.* 59 (1937)(denying coverage under accidental means policy where insured died from septicemia after deliberately pulling hair from nose). Stated another way, if the act leading up to the injury was voluntarily undertaken and nothing unexpected or unforeseen occurred during that act, the resulting injury did not occur by accidental means as a matter of law. *Linden, supra*, 40 *N.J.* at 526, 193 *A.*2d 217.

Analogizing to child abuse and neglect situations, we conclude that the phrase "other than accidental means" refers to the circumstances leading up to the accident. Where an action is deliberate, and the actor can or should foresee that his conduct is likely to result in injury, as a matter of law, that injury is caused by "other than accidental means." *See Schwartz v. John Hancock Mut. Life Ins. Co.*, 96 *N.J.Super.* 520, 525, 233 *A.*2d 416 (Law Div.1967), *aff'd* 99 *N.J.Super.* 223, 239 *A.*2d 248 (App.Div.1968) (citing *Shields v. Prudential Ins. Co. of America*, 6 *N.J.* 517, 523, 79 *A.*2d 297 (1951)); *Furr v. Metropolitan Life Ins. Co.*, 111 *N.J.Super.* 596, 600, 270 *A.*2d 69 (Law Div.1970) (stating injury induced by insured's culpable conduct, which is reasonable and probable consequence of conduct, is not accidental). "[I]f an intentional act produces an unintended result[,]" the injury is not accidental. A parent or guardian can commit child abuse even though the resulting injury is not intended. DYFS and the courts must examine the circumstances leading up to the injury to determine whether it was caused by accidental means. The intent of the parent or guardian is irrelevant. *See State v. Demarest*, 252 *N.J.Super.* 323, 331, 599 *A.*2d 937 (App.Div.1991)(stating definition of child abuse and neglect under Title 9 describes only kind of harm to child and not mental state of accused).

■ The legislative history of Title 9, precedent, and public policy support the conclusion that a Title 9 inquiry must focus on the circumstances leading up to the injury and on the harm to the child, and not on the guardian's intent. In the Child Abuse Study Commission Interim Report, which formed the basis for Title 9, the Commission recommended that the

> laws and procedure[s] ... [of Title 9 be] based primarily on the condition of the child and not focused on assessing or assigning the guilt or responsibility for the child's plight. The State's first move should be to protect the child, and second to investigate the reasons for his neglect. The emphasis should be on concern for the child's welfare, not determination of guilt.
>
> [*New Jersey Legislature Child Abuse Study Commission Interim Report*, pursuant to Concurrent Res. No. 86 at 15–16 (Nov. 15, 1971).]

Accordingly, under Title 9, whether the guardian intended to harm the child is irrelevant. If a parent or guardian commits an intentional act that has unintended consequences, that action is considered "other than accidental" within the meaning of Title 9.

*State v. Demarest, supra,* 252 *N.J.Super.* at 331, 599 *A.*2d 937, also supports our conclusion that the guardian's intent to injure the child is irrelevant to determining whether an injury was caused by accidental means. *Demarest* raised the question of what mental state is required to hold a parent criminally liable for endangering the welfare of a child under *N.J.S.A.* 2C:24–4(a). The criminal provision incorporated, by reference, the definition of "abused" and "neglected" child contained in *N.J.S.A.* 9:6–8.21, the civil statute.

The court concluded that the definition of child abuse and neglect contained in the civil provision "describe[d] only the kind of 'harm' to the child and not the mental state of the accused required to establish an offense." *Demarest, supra,* 252 *N.J.Super.* at 331, 599 *A.*2d 937. The main goal of Title 9 is to protect children "from acts or conditions which threaten their welfare." *Ibid.* A standard that focuses on the caregiver's intent essentially imposes a *mens rea* requirement on the civil context and confounds the goals of criminal and civil abuse statutes. *Id.* at 330, 599 *A.*2d 937. Focusing on the guardian's intent also would prevent the State from safeguarding children in a substantial

number of child neglect situations. *Ibid.* Title 9's primary concern is the protection of children, not the culpability of parental conduct. *Ibid.* Whether the resulting injury was intended is irrelevant to the determination of whether the injury was caused by accidental means.

## IV.

Having decided that *N.J.S.A.* 9:6–8.21(c)(4) can apply to some accidentally-caused injuries, the next question is what standard of care is codified by the phrase "failure to exercise a minimum degree of care."

*N.J.S.A.* 9:6–8.21(c)(4) requires a finding that a child's physical, mental, or emotional condition has "been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian . . . to exercise a minimum degree of care." G.S. argues that she did not fail to exercise a minimum degree of care because her actions were inadvertent and she did not intend to harm N.D. She contends that New Jersey law requires a guardian to act with a willful or purposeful intent to commit child abuse. DYFS, on the other hand, urges us to conclude that the standard announced in *N.J.S.A.* 9:6–8.21 is a simple negligence standard. DYFS argues that a guardian can fail to exercise a minimum degree of care even though he or she does not specifically intend to harm the child.

We do not agree with either party's interpretation of the standard of care under *N.J.S.A.* 9:6–8.21(c)(4)(b). If the Legislature intended DYFS and the courts to apply an "intent" standard, it would have stated so explicitly. Similarly, if the Legislature intended to codify a negligence standard, it would have used the phrase "failure to exercise reasonable care." *See Chase Manhattan Bank, supra,* 135 *N.J.* at 227, 638 *A.*2d 1301 (recognizing that courts presume that Legislature is familiar with existing judicial interpretation). We think the phrase "failure to exercise a minimum degree of care" was chosen to capture a middle standard.

■ The phrase "minimum degree of care" denotes a lesser burden on the actor than a duty of ordinary care. If a lesser measure of care is required of an actor, then something more than ordinary negligence is required to hold the actor liable. The most logical higher measure of neglect is found in conduct that is grossly negligent because it is willful or wanton. Therefore, we believe the phrase "minimum degree of care" refers to conduct that is grossly or wantonly negligent, but not necessarily intentional. *See Miller v. Newsweek*, 660 *F.Supp.* 852, 858–59 (D.Del. 1987).

■ Conduct is considered willful or wanton if done with the knowledge that injury is likely to, or probably will, result. *McLaughlin v. Rova Farms, Inc.*, 56 *N.J.* 288, 305, 266 *A.*2d 284 (1970). Because risks that are recklessly incurred are not considered unforeseen perils or accidents in the eyes of the law, actions taken with reckless disregard for the consequences also may be wanton or willful. *Ibid.; Egan v. Erie Railroad Co.*, 29 *N.J.* 243, 254–55, 148 *A.*2d 830 (1959). So long as the act or omission that causes injury is done intentionally, whether the actor actually recognizes the highly dangerous character of her conduct is irrelevant. *See McLaughlin, supra,* 56 *N.J.* at 305, 266 *A.*2d 284. Knowledge will be imputed to the actor.

As our previous cases have recognized, the difference between merely negligent conduct and wanton and willful misconduct cannot be described with mathematical precision. *Ibid.* "Like many legal characterizations, willful misconduct is not immutably defined but takes its meaning from the context and purpose of its use." *Fielder v. Stonack*, 141 *N.J.* 101, 124, 661 *A.*2d 231 (1995). The label turns on an evaluation of the seriousness of the actor's misconduct. *McLaughlin, supra,* 56 *N.J.* at 306, 266 *A.*2d 284. Although it is clear that the phrase implies more than simple negligence, it can apply to situations ranging from "slight inadvertence to malicious purpose to inflict injury." *Id.* at 305, 266 *A.*2d 284; *Krauth v. Israel Geller and Buckingham Homes, Inc.,* 31

*N.J.* 270, 277, 157 *A.*2d 129 (1960)(stating wantonness is an advanced degree of negligent misconduct).

Essentially, the concept of willful and wanton misconduct implies that a person has acted with reckless disregard for the safety of others. *Fielder, supra,* 141 *N.J.* at 123, 661 *A.*2d 231; *McLaughlin, supra,* 56 *N.J.* at 305, 266 *A.*2d 284. Where an ordinary reasonable person would understand that a situation poses dangerous risks and acts without regard for the potentially serious consequences, the law holds him responsible for the injuries he causes. *Ibid.* Thus, under a wanton and willful negligence standard, a person is liable for the foreseeable consequences of her actions, regardless of whether she actually intended to cause injury.

In *Foldi v. Jeffries,* 93 *N.J.* 533, 549, 461 *A.*2d 1145 (1983), we stated that the wanton and willful standard is an "intermediary position between simple negligence and the intentional infliction of harm." In holding that the doctrine of parental immunity would not shield a parent who wantonly or willfully "failed to watch over his or her child," we recognized that the standard reflected a compromise between a parent's right to raise a child as he sees fit and the child's right to receive protection from injuries resulting from a parent's lack of supervision. *Id.* at 546–47, 461 *A.*2d 1145. A higher standard was rejected because it would insulate a parent from liability for injuries produced by the parent's failure to protect the child. *Ibid.* A simple negligence standard was rejected because it would impose the State's views on parenting techniques onto the citizens of this State. *Id.* at 545–46, 461 *A.*2d 1145. Gross negligence was seen as the point at which "parental neglect properly becomes a matter of public concern." *Ibid.*

The concerns addressed in *Foldi* are similar to those raised here. Many findings of abuse and neglect under *N.J.S.A.* 9:6–8.21 are rendered against parents. In interpreting this section, therefore, we must be mindful of a parent's constitutional right to raise his or her child without undue state interference. *Santosky v. Kramer,* 455 *U.S.* 745, 753–54, 102 *S.Ct.* 1388, 1394–95, 71 *L.Ed.*2d

599, 606 (1982); *Foldi, supra,* 93 *N.J.* at 545, 461 *A.*2d 1145. That concern must be balanced against the State's *parens patriae* power to protect children from acts that negatively impact on their health and safety. *See Foldi, supra,* 93 *N.J.* at 545–47, 461 *A.*2d 1145; *State v. P.Z.,* 152 *N.J.* 86, 98–99, 703 *A.*2d 901 (1997). A wanton and willful negligence standard allows the State to intervene to protect children without unduly infringing on parents rights to raise and discipline their children.

In rejecting an intent standard, we note that New York courts, interpreting similar statutory language, also have declined to impose an intent requirement in child neglect cases. New York's abuse and neglect statute defines "neglected child" as one whose "physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent or [guardian] to exercise a minimum degree of care." *N.Y. Family Court Act* § 1012(f) (McKinney 1998). Where the conduct has the potential to cause serious injury, the fact that the guardian does not intend to injure the child is irrelevant. *See Gill v. Perales,* 203 *A.D.*2d 978, 612 *N.Y.S.*2d 708 (1994) (finding neglect where mother slapped son causing unintentional injury). Even an isolated unintentional injury may form the basis for a finding of neglect where the intrinsic danger of the situation is obvious. *In the Matter of James HH,* 234 *A.D.*2d 783, 652 *N.Y.S.*2d 633, 635 (1996) (finding neglect despite accidental injury where father left one-year old child unsupervised and child sustained burns from placing hand on kerosene heater).

Viewing the practical implications of our decision in light of the purposes of Title 9 lends support to our conclusion that the proper focus of an inquiry under *N.J.S.A.* 9:6–8.21 is on the harm to the child. There is a wide range of harmful conduct that all reasonable persons would characterize as neglect, regardless of the caregiver's intent. *See Public Hearing Before the New Jersey Legislature Child Abuse Study Commission,* at 29 (March 26, 1971) (finding that in many situations parent does not have deliberate intent to harm child but still commits abuse or neglect).

For example, if a parent left a two-year old child alone in a house and went shopping, the child would be considered a neglected child within the meaning of Title 9 regardless of whether the parent intended to impair the child's well-being or harm the child. *See Public Hearing Before the New Jersey Legislature Child Abuse Study Commission*, at 42 (March 26, 1971) (statement of Dr. Bernice Boehm). Were we to adopt the Appellate Division's view and hold that the inquiry in neglect and abuse cases should focus on the caregiver's intent, DYFS would be unable to protect children from a wide range of conduct that clearly qualifies as neglect.

Accordingly, we hold that a guardian fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child. *See In the Matter of Sellnow v. Perales*, 158 *A.D.*2d 846, 551 *N.Y.S.*2d 428, 429 (1990). In *Sellnow*, for example, the New York Appellate Division upheld a finding of neglect where a stepmother accidentally gouged her stepson's face when striking him. The court held that the stepmother "failed to exercise a minimum degree of care by recklessly creating a risk of serious injury to the child's eye." *Ibid.* "The danger that a child may be seriously injured when struck in the face by a person with long protruding fingernails is readily apparent." *Ibid.; see also In the Matter of King v. Perales,* 153 *A.D.*2d 694, 544 *N.Y.S.*2d 869 (1989) (finding mother failed to exercise minimum degree of care by pouring scalding water into child's bath without testing temperature since danger that child will be burned when recently boiled water is poured into confined area is readily apparent); *In the Matter of Lydia K.,* 123 *Misc.*2d 41, 472 *N.Y.S.*2d 576, 578 (Fam.Ct.1984), *aff'd.* 112 *A.D.*2d 306, 491 *N.Y.S.*2d 752 (1985), *aff'd.*, 67 *N.Y.*2d 681, 499 *N.Y.S.*2d 684, 490 *N.E.*2d 551 (1986)(finding failure to exercise minimum degree of care where child fell out of eighth story window).

Whether a parent or guardian has failed to exercise a minimum degree of care is to be analyzed in light of the dangers

and risks associated with the situation. We recognize that a variety of factual scenarios can give rise to the finding that a guardian has failed to exercise a minimum degree of care, and do not attempt to describe them. We simply remind DYFS and the courts that the inquiry should focus on the harm to the child and whether that harm could have been prevented had the guardian performed some act to remedy the situation or remove the danger. When a cautionary act by the guardian would prevent a child from having his or her physical, mental or emotional condition impaired, that guardian has failed to exercise a minimum degree of care as a matter of law. Ultimately, we leave it to DYFS and the courts to determine, on a case-by-case basis, whether a caregiver has failed to exercise a minimum degree of care in protecting a child.

## V.

In this case, we conclude that there was sufficient evidence to support a finding of neglect. Initially, we note that the overdose was not caused by accidental means. G.S. intentionally gave N.D. the entire bottle of medicine. There was nothing in the circumstances leading up to the injury that was "unusual" or "unexpected." Although G.S. did not intend to administer an overdose and the results of her actions were accidental, the action itself was deliberate. G.S. intentionally gave N.D. the entire bottle. The fact that she foolishly thought that the entire bottle contained only one dose does not mean that the incident was caused by accidental means.

G.S.'s conduct indisputably demonstrates that she failed to exercise a minimum degree of care. When G.S. opened the bottle of medicine, she was unsure how much she was supposed to administer. She did not call N.D.'s mother to seek clarification; she did not call a pharmacy to find out how large one pill was. She did absolutely nothing to ensure that she was administering the correct dosage. Instead, she recklessly gave N.D. the entire bottle of medication.

That conduct clearly rises to the level of wanton or willful. Intelligent adults understand the grave dangers associated with prescription medication. As a medication administrator, G.S. should have been particularly sensitive to the dire consequences that could result from over-medicating a child. Even though she did not intend harm to befall N.D., she utterly disregarded the substantial probability that harm would result from her actions. If he was on different medication, the outcome could have been more tragic.

If N.D. had sustained permanent injury, there would have been little dispute that G.S. committed an act of child abuse or neglect. That fact alone should not affect the findings in this case. G.S. acted with reckless disregard for the probable consequences of her actions. By taking no action to clarify the situation, G.S. failed to exercise even a minimum degree of care toward N.D. Those facts are sufficient to hold her liable for child neglect under *N.J.S.A.* 9:6–8.21(c)(4)(b). The judgment of the Appellate Division is reversed.

*For reversal*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN, and COLEMAN—7.

*Opposed*—None.