FASCIALE, J.A.D.
*953 *468 In this appeal from a final agency decision by the Commissioner of Education (the Commissioner), we address three legal questions related to the rights that Beryl Zimmerman and Judy Comment (collectively petitioners) enjoy pursuant to the New Jersey Tenure Act (the Tenure Act), N.J.S.A. 18A:28-1 to -18. Petitioners worked as part-time tenured teachers for the Sussex County Educational Services Commission (SCESC). Petitioners provided remedial instruction to eligible students in non-public schools.
The parties resorted to litigation after the SCESC reduced petitioners' annual income by decreasing their work hours. The Commissioner concluded that their tenure and seniority rights under the Tenure Act did not protect them from that reduction because their collective bargaining agreement (CBA) and employment contracts omitted a guaranteed minimum number of work hours. Specifically, the Commissioner determined that the decrease in work hours did not reduce their compensation or trigger their seniority rights under the Tenure Act. In reaching this conclusion, the Commissioner focused only on petitioners' hourly *469 rates, which did not decrease, rather than also considering their seniority status and actual reduction in annual income.
The first question is whether the failure to include language in the contracts that guaranteed petitioners a minimum number of hours deprived them of their tenure and seniority rights under the Tenure Act. We hold that the omission of that information from those documents does not deprive petitioners of those rights. Once petitioners obtained tenure, the Tenure Act required that tenure be a mandatory condition of their employment. The failure to guarantee a minimum number of hours in the contract documents cannot strip petitioners of their tenure rights, specifically the protection against reduction in compensation. To hold otherwise would render their undisputed tenure and seniority status meaningless. We therefore reverse the Commissioner's decision that petitioners are without protection under the Tenure Act.
On the remaining two issues, whether the reduction in hours reduced petitioners' compensation under N.J.S.A. 18A:28-5 and whether the reduction in hours triggered petitioners' seniority rights, we remand for further proceedings consistent with this opinion. We do so because the Commissioner upheld findings reached by an administrative law judge (ALJ), who adjudicated those issues on an incomplete record using limited stipulations of fact on motions for summary disposition.
The remand proceedings will give the agency the opportunity to exercise its technical expertise in the first instance. On remand, we direct the ALJ to apply the term "compensation" by considering the practical effect of the reduction in hours on petitioners' annual income. We also instruct the ALJ to determine whether the decrease in hours resulted in a reduction in force (RIF), and if so, devise the appropriate remedy. Doing so will enable further meaningful judicial review if need be.
I.
The SCESC provides educational auxiliary and remedial support and programs in the non-public school setting.[2] The record *954 is *470 unclear, but at some point, the SCESC employed ten part-time teachers on a ten-month term to provide these educational services. Some of them, like petitioners, were tenured, and some were not. Petitioners each provided three categories of educational instruction.
The Legislature codified the first category of educational services in N.J.S.A. 18A:46A-1 to -17 (Chapter 192, or Chapter 192 services). Chapter 192 services, which the State funds, are available to eligible students enrolled full-time in non-public elementary and secondary schools. The Legislature declared the public policy behind Chapter 192 services in N.J.S.A. 18A:46A-1, which provides:
The Legislature hereby finds and determines that the welfare of the State requires that present and future generations of school age children be assured opportunity to develop to the fullest their intellectual capacities. It is the intent of this Legislature to [e]nsure that the State shall furnish on an equal basis auxiliary services to all pupils in the State in both public and nonpublic schools.
"Auxiliary services" means "compensatory education services for the improvement of students' ... communication skills; supportive services for acquiring communication proficiency in the English language for children of limited English-speaking ability; and home instruction services." N.J.S.A. 18A:46A-2(c). "Compensatory education services" means
preventive and remedial programs offered during the normal school day, or in programs offered beyond the normal school day or during summer vacation, which are integrated and coordinated with programs operated during the regular school day and year. The programs shall be approved by the State Board of Education, supplemental to the regular programs and designed to assist pupils who have academic needs that prevent them from succeeding in regular school programs.
[ N.J.S.A. 18A:46A-2(e).]
*471 Thus, Chapter 192 services provide non-public school students with auxiliary compensatory education in basic skills, such as reading, writing, and math, as well as English as a second language, and home instruction.
The Legislature codified the second category of educational services in N.J.S.A. 18A:46-19.1 to -19.10 (Chapter 193, or Chapter 193 services). Chapter 193 services, which the State also funds, are available to eligible students enrolled full-time in non-public elementary and secondary schools. The Legislature declared the public policy behind Chapter 193 services in N.J.S.A. 18A:46-19.1, which provides:
The Legislature hereby finds and determines that the security and welfare of the State require that all school-age children be assured the fullest possible opportunity to develop their intellectual capacities. In order to achieve this objective it is the intent of this Legislature to require that the State and local communities identify and provide remedial services for handicapped children in both public and nonpublic schools.
Thus, Chapter 193 services provide non-public schools with services for students with disabilities, including evaluation and determination of eligibility for special education, and supplementary instruction and speech-language services. Chapter 193 services supplement the third category of educational services.
The third category consists of services provided pursuant to the Individuals with Disabilities Education Improvement Act (IDEIA), 20 U.S.C. §§ 1400 to 1482. The IDEIA requires school districts to provide *955 special education and related services designed to meet the needs of children with disabilities. The federal government funds the IDEIA services.
The parties stipulated that Comment is a part-time tenured teacher "who holds an instructional certificate with endorsements as an elementary N-8 teacher, as well as a K-12, [h]ighly [q]ualified English Teacher." She worked for the SCESC beginning in the 1997-1998 school year. Comment provided Chapter 192, Chapter 193, and IDEIA services at various non-public schools in Sussex County.
*472 Comment's 2013-2014 contract reflects an hourly rate of $32.98. She worked approximately 1117 hours and earned $36,838.74 for the 2013-2014 year. Comment's 2014-2015 contract reflects an hourly rate of $33.79. She worked approximately 305 hours and earned $10,331.13 for the 2014-2015 year. During the 2014-2015 year, the SCESC limited her teaching to Chapter 192 instruction, and changed the class size to no fewer than three students. Therefore, for the 2014-2015 school year, the SCESC decreased her hours by approximately 784, prevented her from providing Chapter 193 and IDEIA instruction, and reduced her income by $26,507.61. The record is silent as to the years prior to 2013.
As to Zimmerman, the parties stipulated that she is a part-time tenured teacher "who holds an educational certificate with an endorsement as an elementary school teacher"; she worked for the SCESC since the 2002-2003 school year; and she provided Chapter 192, Chapter 193, and IDEIA services at various non-public schools in Sussex County.
Zimmerman's 2013-2014 contract reflects an hourly rate of $28.98. She worked approximately 954 hours and earned $27,668.81 for the 2013-2014 year. Zimmerman's 2014-2015 contract reflects an hourly rate of $29.79. She worked approximately 658 hours and earned $19,603.42 for the 2014-2015 year. As with Comment, in the 2014-2015 year, the SCESC limited her teaching to Chapter 192 instruction, and changed the class size to no fewer than three students. Therefore, for the 2014-2015 school year, the SCESC decreased her hours by approximately 270, prevented her from providing Chapter 193 and IDEIA instruction, and reduced her income by $8065.39. The record is silent as to the years prior to 2013.
The parties disputed whether the SCESC correctly limited petitioners' instruction to Chapter 192 services during the 2014-2015 year. Petitioners asserted before the ALJ that the SCESC "improperly eliminated the[ir] Chapter 193/IDEIA hours [that] they had enjoyed in the past on the erroneous belief that they could not provide Chapter 193/IDEIA services without a 'students *473 with disabilities' or 'teacher of the handicapped' certification." The ALJ did not adjudicate that dispute. On this record, we are unable to evaluate petitioners' contention at oral argument before us that even if that was the case, there would have been enough Chapter 192 services during the 2014-2015 school year to maintain petitioners' previous workload.
Of the remaining eight part-time tenured teachers retained by the SCESC, the parties stipulated generally as to the teaching instruction for only four of them. Three of those four were non-tenured, and worked during the 2014-2015 school year, and two of whom worked during the 2013-2014 school year. The parties agree that the fourth "attained tenure and seniority rights," and that she had worked for the SCESC since the 2002-2003 school year. The parties dispute whether these four teachers benefited from the hours that petitioners lost during the 2014-2015 school *956 year. We have no information as to the remaining part-time teachers.
II.
We now turn to the petitioners' protections under the Tenure Act and related jurisprudence. Specifically, the protection against reduction in compensation. Doing so informs our conclusion that after petitioners achieved tenure, the Tenure Act makes tenure a mandatory condition of their employment, which superseded the purported effect of the omission of a contractual guaranteed minimum number of hours. Undertaking this analysis provides further support for our holding that the omission of that contractual language does not deprive petitioners of their tenure and seniority protections under the Tenure Act.
For more than thirty years, the precedent in this State has been that part-time teachers are eligible for tenure under the Tenure Act. Spiewak v. Bd. of Educ., 90 N.J. 63, 75, 447 A.2d 140 (1982). Part-time teachers, like petitioners, are entitled to tenure *474 so long as they satisfy the requirements of N.J.S.A. 18A:28-5.[3] Thus, part-time teachers like petitioners are entitled to tenure if they "(1) ... work[ ] in a position for which a teaching certificate is required; (2) ... hold[ ] the appropriate certificate; and (3) ... [have] served the requisite period of time." Spiewak, 90 N.J. at 74, 447 A.2d 140. Here, it is undisputed that petitioners are tenured.[4]
As to the critical educational instruction available through the SCESC, the importance of the Tenure Act cannot be underestimated. Our Court has recognized that providing adequate remedial education to students with special needs is "a permanent part of New Jersey's system of 'thorough and efficient education.' " Id. at 75, 447 A.2d 140 (quoting N.J.S.A. 18A:7A-2 (repealed 1996)). One purpose of the Tenure Act is to "prevent[ ] school boards from abusing their superior bargaining power over teachers in contract negotiations." Id. at 73, 447 A.2d 140. Thus, the Tenure Act ensures an even playing field between the parties in the remedial education setting.
Once achieved, "[the Tenure Act] makes tenure a mandatory term and condition of employment." Id. at 72, 447 A.2d 140. Public employees and employers are not free to "agree to contractual terms [or the lack thereof] that contravene a specific term or condition of employment set by a statute." Id. at 76, 447 A.2d 140. "[T]he tenure provisions of N.J.S.A. 18A:28-5 constitute a mandatory contractual term that may not be waived or bargained away." Spiewak, 90 N.J. at 76, 447 A.2d 140. Thus, the failure to guarantee *475 a minimum number of hours cannot eliminate petitioners' statutory protection from reduction in compensation.
Just as eligibility for tenure cannot be dependent "on the contractual agreement between ... teachers and [a] board of education," id. at 77, 447 A.2d 140, neither can the statutory tenure protections provided *957 to petitioners-such as protection from reduction in compensation-once they obtained tenure under the Tenure Act. "As a practical matter, the protection of tenure would be greatly reduced if it were subject to contract principles." Id. at 80, 447 A.2d 140. Petitioners' flexible work schedules and the absence of a contractual guaranteed minimum number of hours cannot alter the prohibition against a reduction in compensation contained in N.J.S.A. 18A:28-5. Contrary to the SCESC's contention, the absence of a contractual guarantee to a minimum number of hours in petitioners' CBA and employment contracts is therefore not dispositive. Petitioners are therefore entitled to the protections of the Tenure Act, including but not limited to protection from reduction in compensation.
The Commissioner determined that because petitioners were not contractually entitled to a minimum number of hours, there would be no reduction in compensation if their hourly rate remained the same. Because such an application of the word "compensation," as that term is used in N.J.S.A. 18A:28-5, would render nugatory petitioners' tenure rights, we reject the Commissioner's approach.
III.
Determining the definition of "compensation" in N.J.S.A. 18A:28-5 is a legal question. "In matters of statutory interpretation, our review is de novo." Verry v. Franklin Fire Dist. No. 1, 230 N.J. 285, 294, 166 A.3d 1140 (2017). We "are not bound by an agency interpretation of a strictly legal issue when that interpretation is inaccurate or contrary to legislative objectives." G.S. v. Dep't of Human Servs., 157 N.J. 161, 170, 723 A.2d 612 (1999) (citation omitted). Such is the case here.
*476 "The Legislature's intent is the paramount goal when interpreting a statute and, generally, the best indicator of that intent is the statutory language." DiProspero v. Penn, 183 N.J. 477, 492, 874 A.2d 1039 (2005). A court should "ascribe to the statutory words their ordinary meaning and significance, and read them in context with related provisions so as to give sense to the legislation as a whole." Ibid. (citations omitted). "[I]f there is ambiguity in the statutory language that leads to more than one plausible interpretation, we may turn to extrinsic evidence, 'including legislative history, committee reports, and contemporaneous construction.' " Id. at 492-93, 874 A.2d 1039 (quoting Cherry Hill Manor Assocs. v. Faugno, 182 N.J. 64, 75, 861 A.2d 123 (2004) ). There is no need to use extrinsic evidence to define the word "compensation" under the Tenure Act.
For full-time teachers, compensation generally refers to their annual income. Such a reference also applies to petitioners. We reach that conclusion ascribing the ordinary meaning and significance of the word "compensation" in the context of the Tenure Act. Of course, we are mindful of the Tenure Act's remedial purpose to "prevent[ ] school boards from abusing their superior bargaining power over teachers in contract negotiations," Spiewak, 90 N.J. at 73, 447 A.2d 140, and the principle that "the Tenure Act should be liberally construed to achieve its beneficent ends," id. at 74, 447 A.2d 140. The Tenure Act should not be interpreted to permit avoidance of a fair application of the term "compensation" as to petitioners. For us, the challenge is how to apply the term to petitioners, rather than the meaning of the word.
Focusing only on hourly rate by itself to define petitioners' compensation fails to recognize the amount of their annual income. We understand their yearly hours *958 might change depending on the number of students in need of remedial instruction. Using solely the hourly rate does not capture that reduction. For example, if they worked 1000 hours last year at $30, their income would be $30,000. If they worked one hour this year because the need *477 changed, then they would have earned $30. Even though their hourly rate remained the same, their income dropped by $29,970. There is another way to calculate compensation-or annual income-without prejudicing the parties.
It is obvious, because of the number of fluctuating hours that they might work based on pupils in need of remedial instruction, that petitioners have no right to a minimum number of hours per year. But they do have seniority, which means the parties could establish the percentage of available work to which they are entitled. Focusing on seniority illuminates whether there has been a reduction in their annual income under the Tenure Act, even if the available educational need fluctuates.
For example, assume petitioners' seniority status entitles each of them to forty percent of the available work for the 2013-2014 school year. Assume further that during that year, the educational need for SCESC's services created 1000 hours of instructional service. Petitioners would be entitled to an allocation of forty percent of the 1000 hours for the 2013-2014 year. If the educational demand for the 2014-2015 year decreased to 500 hours, then based on seniority, petitioners would receive forty percent of the 500 hours. This hypothetical accounts for annual income and considers petitioners' flexible hours based on educational need for SCESC's services.
This approach safeguards against a reduction in annual income without forcing the SCESC to pay petitioners for hours they do not work due to a reduction in educational need. It does so recognizing that petitioners worked on an as-needed basis. There would be no prejudice to the SCESC because the compensation level-or annual income-depends on seniority, rather than an artificial expectation to a minimum number of work hours during a given school year. Applying petitioners' actual hourly rates to this hypothetical demonstrates this fact. We do so as to petitioners separately.
Comment would have earned $13,192 (multiplying 400 by $32.98) for the 2013-2014 school year. She would have earned $6758 *478 (multiplying 200 by $33.79) for the 2014-2015 school year. Even though Comment's income dropped by $6434 in the 2014-2015 school year, there would be no reduction in compensation under the Tenure Act because her seniority percentage remained the same.
Zimmerman would have earned $11,592 (multiplying 400 by $28.98) for the 2013-2014 school year. She would have earned $5958 (multiplying 200 by $29.79) for the 2014-2015 school year. Even though Zimmerman's income dropped by $5634 in the 2014-2015 school year, there would be no reduction in compensation under the Tenure Act because her seniority percentage remained the same.
Finally, to illustrate our point that the SCESC's consideration of only the hourly rate to calculate petitioners' compensation ignores their actual reduction in annual income, we look to the substantial earnings they lost by the reduction of hours during the 2014-2015 school year. The SCESC reduced Comment's income by $26,507.61, and reduced Zimmerman's income by $8065.39. Relying solely on their hourly rate to show no decrease in compensation is absurd on its face. This cannot be what the Legislature envisioned. The decrease to petitioners' seniority-percentage allocation more realistically illuminates the reduction *959 in petitioners' annual income under the Tenure Act.
We remand on the issue of compensation because of the incompleteness of the record. Calculating petitioners' compensation, given their flexible workload, so that it comports with N.J.S.A. 18A:28-5, may require establishing petitioners' seniority percentage as compared to each other and the other part-time teachers, and then multiplying petitioners' hourly rates, which should remain the same or increase, like here, by the number of hours worked. Using this approach, the answer to whether the SCESC reduced petitioners' compensation would turn on whether it reduced that seniority percentage. On remand, we do not mean to limit the exercise of the agency's expertise in devising any other reasonable means for determining the annual income, and then to *479 apply the term "compensation" to petitioners pursuant to the Tenure Act.
IV.
Finally, as to the third legal issue, whether the decrease in hours triggered their seniority rights because that reduction may have amounted to a RIF, we remand for further proceedings to develop the reasons for the reduction in petitioners' hours. We do so recognizing that in some instances, a reduction in hours triggers seniority rights under the Tenure Act.
The Tenure Act protects tenured teachers by providing "a measure of security in the ranks they hold after years of service." Viemeister v. Bd. of Educ., 5 N.J. Super. 215, 218, 68 A.2d 768 (App. Div. 1949). "Seniority is a by-product of tenure and comes into play only if tenure rights are reduced by way of dismissal or reduction in ... benefits." Carpenito v. Bd. of Educ., 322 N.J. Super. 522, 531, 731 A.2d 538 (App. Div. 1999). In Klinger v. Board of Education, 190 N.J. Super. 354, 357, 463 A.2d 948 (App. Div. 1982), we held that a reduction in hours of employment is considered a RIF. N.J.S.A. 18A:28-9 governs RIFs and states:
Nothing in this title or any other law relating to tenure of service shall be held to limit the right of any board of education to reduce the number of teaching staff members, employed in the district whenever, in the judgment of the board, it is advisable to abolish any such positions for reasons of economy or because of reduction in the number of pupils or of change in the administrative or supervisory organization of the district or for other good cause upon compliance with the provisions of this article.
We understand the difficulty associated with determining petitioners' seniority and associated tenure rights, especially because their service may be pro-rated, but the incomplete record has hampered our ability to resolve whether petitioners' reduction of hours amounted to a RIF. At a minimum, we do not know the basis for the reduction of hours, such as whether it was for economic reasons, reduction in enrollment, improper certification, or for other good cause. Therefore, we are unable to determine whether the reduction in hours constituted a RIF, the SCESC
*480 violated petitioners' seniority rights, and the related appropriate remedies.
Reversed and remanded. We do not retain jurisdiction.

The SCESC operates a public school called the Northern Hills Academy, which provides educational services for Sussex County students with special needs. On this record, we are unable to determine whether petitioners provided teaching instruction there, and if so, what impact those services would have on the issues before us.

N.J.S.A. 18A:28-5(a) pertains to all teaching staff members employed prior to the effective date of L. 2012, c. 26 (N.J.S.A. 18A:6-117 to -129), which provides: "This act shall take effect in the 2012-2013 school year ....'' N.J.S.A. 18A:28-5(b) pertains to all teaching staff members employed on or after this effective date. On this record, we understand that petitioners earned tenure before 2012.

Substitute teachers are ineligible for tenure under the Tenure Act, N.J.S.A. 18A:16-1.1, but the parties agree that petitioners are not substitute teachers or temporary employees who "act in place of any ... employee during the absence, disability or disqualification of any such ... employee." Ibid.