# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1486-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

E.K.,

     Defendant-Appellant,

and

D.K.,

     Defendant.

_____

IN THE MATTER OF J.K.
and K.H., minors.

_____

Submitted February 3, 2021 – Decided June 28, 2021

Before Judges Ostrer and Vernoia.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FN-13-0163-17.

Joseph E. Krakora, Public Defender, attorney for appellant (Caitlin A. McLaughlin, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jane C. Schuster, Assistant Attorney General, of counsel; Deirdre A. Carver, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Nancy P. Fratz, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

In this appeal from a Title Nine fact-finding order, E.K. (Emily) contends the trial court relied on insufficient and incompetent evidence, and the evidence did not support the court's finding that, by acting without a minimum degree of care, she placed her children in imminent danger.[1] The Division of Child Protection and Permanency, and the Law Guardian representing the children, oppose the appeal.

We affirm.

---

[1] We use initials and fictitious names for defendants and the children to protect their privacy and preserve the confidentiality of the proceedings. R. 1:38-3(d)(12).

I.

The case arises out of the events of one Christmas day. Emily was still married to, but separated from, D.K. (David). David and Emily's son J.K. (Joseph) was then five years old. Emily's daughter K.H. (Karen) was almost ten.

David was the principal witness at the fact-finding hearing. He testified that because Emily's driving privileges were recently suspended for driving under the influence, he agreed to drive her and the children to Emily's family's home in Northern New Jersey for a holiday gathering. David saw Emily consume "several drinks" starting around 5:30 or 6:00 p.m. He said she was not behaving "in a civil like manner," and gave him "attitude" when he said he had to leave soon, because he had to work the next day. They left around 10:30 p.m.

Once in the car, Emily gave David directions back to the New Jersey Turnpike, but he made some wrong turns and then used his GPS. Emily "became . . . really irate," yelled, and asked why David wasn't listening to her, since she knew the way. Seconds after he entered the Turnpike on the southbound side, Emily "struck [him] and hit [him]" one time in the face, and he pulled onto the shoulder. Both children were awake in the backseat. Joseph was in a child safety seat, and Karen sat in the car's regular seat with a seatbelt.

A-1486-19

Once David stopped the car, Emily continued yelling at him, then left the car, and ran to a nearby overpass, about thirty feet away. David told the children to stay in the car because he was going to get their mother. Emily tried to climb onto the three-and-a-half-foot overpass wall in an apparent attempt to jump to the ground one-story below. As she placed her arms over the top of the wall, trying to pull her body up, she screamed at David to leave her alone. David pleaded with her to stop, seemingly to no avail. He then restrained her in a hug and pulled her back to street level. They then walked back to the car. David got in as Emily gathered her things that had fallen out of the car.

Then Emily left again, this time to run onto the turnpike roadway. While other cars traveled the turnpike, she crossed all the southbound lanes and reached the median. David again told the children to stay in the car, then gave chase and caught up to Karen at the median. He pulled her back to the car. David was nearly hit by oncoming traffic as they ran back. David said that had Emily resisted, they "probably both would have been killed."

When David and Emily returned to the car, the children were upset. David resumed driving, Emily continued "yelling and screaming," and the children asked Emily to stop. Joseph said it was the worst day of his life, and Karen was screaming to her mother to please stop. Emily hit David about four more times

A-1486-19

throughout the ride. David denied ever hitting Emily the entire night. He repeatedly asked her to stop, telling her she was going to cause an accident and hurt them and the children. He also tried unsuccessfully to call 911 multiple times.

Emily "threatened the children and told them that, if they didn't say they were sleeping [during the incidents], that she was going to send them away" to Texas. This threat "frightened and scared" the children. Karen became "pretty distraught."

To calm Emily down, David said they were driving home, but before he reached that destination, he drove to the local police station, where he filed a complaint, and police arrested Emily. She was later transferred to a hospital for psychiatric screening.

The Division's Special Response Unit (SPRU) worker Teresa Lesniowski recounted her interview with the children the day after the incident and confirmed the accuracy of her written report of the interviews, which was admitted into evidence. The children largely corroborated David's version of events.

Five-year-old Joseph told Lesniowski that he had a good Christmas "until his mom tried to kill herself." He said his parents "were arguing in the car, and

A-1486-19

mommy was punching daddy while he was driving," but David did not hit Emily. Joseph said he pretended to be asleep and stayed in his car seat. Joseph told Lesniowski that "[t]hey pulled over the car, mommy got out on the highway. She was running in front of cars and tried to jump off the side of the road." Joseph told the worker "he was scared that both of his parents were going to die."

Karen told Lesniowski that when her father tried to use the GPS, Emily tried to take his phone and was punching him. Once the car pulled over and David and Emily got out, Karen and Joseph were "screaming for help because they were afraid that somebody was going to get hurt." Karen "said she saw mom try to jump off the side of the bridge." Karen said "she was terrified, she was scared, and she was really upset."

Lesniowski did not speak to Emily because the Division could not locate her in the days immediately after December 25. Another worker ultimately interviewed her.

After the Division rested, the court denied Emily's motion to dismiss. Neither the Law Guardian, nor Emily, presented any witnesses. In summation, Emily's attorney attempted to rely on Emily's exculpatory statements recorded in an investigative summary, although it had been admitted into evidence with

6

the proviso that the court would not consider embedded hearsay not subject to a hearsay exception.

The judge found David's testimony credible, and disregarded Emily's recorded statement as inadmissible hearsay. The judge highlighted the amount of detail in David's testimony, and noted that the children's statements to the worker, "while not exact, clearly corroborates almost everything that [David] said." The judge found that the minor inconsistencies between David's and the children's versions indicated the children were not coached what to say.

The judge also found Emily's actions "clearly created . . . a substantial risk" by forcing David to leave the car with only the hope the children would listen to him and remain in the car. The judge said, "This entire situation did nothing but cause risk to these chil[dren] – imminent risk that something much, much worse could have happened to these children during this situation." Although the judge noted it was hard to believe the children did not suffer emotional harm witnessing their mother's actions that night, he stated he did not need to find emotional harm, as the Division had proved an imminent risk of physical harm.

In its accompanying order, the court found Emily abused or neglected the children when she "engaged in conduct that created imminent risk to the children

7

while traveling on the NJ Turnpike."  The order also noted that the Division would not place Emily's name on the state Child Abuse Registry.

This appeal followed.  Emily challenges the court's fact-finding, contending the court did not base its decision on material and relevant evidence; and she contends the court erred in deciding that the facts demonstrated she failed to exercise a minimum degree of care that resulted in imminent danger to the children.

## II.

We defer to the Family Court's fact-finding because of the court's "special expertise" in family matters and the court's "superior ability to gauge the credibility of the witnesses who testify before it."  N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012).  We will not disturb a trial court's fact-finding "when supported by adequate, substantial, credible evidence," Cesare v. Cesare, 154 N.J. 394, 411-12 (1998), but we scrutinize more closely a "trial judge's evaluation of the underlying facts and the implications to be drawn therefrom," N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting In re J.T., 269 N.J. Super. 172, 188-89 (App. Div. 1993)).  We review issues of law de novo.  Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

A-1486-19

We discern no merit to Emily's argument that the Division "failed to produce sufficient credible, competent evidence to establish exactly what occurred." She highlights minor discrepancies between David's testimony and the children's recollections; asserts David was biased because of his interest in post-divorce custody of the children; and faults the caseworker's failure to interview her.

Yet, "the appraisal of witness credibility is the quintessential . . . function" of the fact-finder. State v. Gunter, 231 N.J. Super. 34, 42 (App. Div. 1989); see also Conrad v. Michelle & John, Inc., 394 N.J. Super. 1, 13 (App. Div. 2007). As required by N.J.S.A. 9:6-8.46(b), the court applied the preponderance-of-the-evidence standard of proof and relied on "only competent, material and relevant evidence." The court also appropriately relied upon the caseworker's testimony "concerning out-of-court statements made to [her] by [the] child[ren] who ha[ve] allegedly been abused," N.J. Div. of Child Prot. & Permanency v. Y.A., 437 N.J. Super. 541, 547 (App. Div. 2014), because they were corroborated by David's testimony, see N.J.S.A. 9:6-8.46(a)(4). Emily identifies no evidentiary errors. Therefore, we shall not disturb the trial court's finding about what happened on the Turnpike during the drive from Emily's parents' home.

A-1486-19

The more significant issue on appeal is whether Emily's behavior supported the court's finding that she abused or neglected her children. A child can be abused or neglected without a showing of actual harm; "imminent danger" is enough to satisfy the statute. Title 9 defines an "[a]bused or neglected child," as "a child whose physical, mental, or emotional condition . . . is in imminent danger of becoming impaired as the result of the failure of his parent . . . to exercise a minimum degree of care . . . . " N.J.S.A. 9:6-8.21(c)(4). That failure may pertain to "providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof . . . or by any other acts of a similarly serious nature requiring the aid of the court." N.J.S.A. 9:6-8.21(c)(4)(b).

The Supreme Court has instructed that "[t]he phrase 'minimum degree of care' denotes a lesser burden on the actor than a duty of ordinary care." G.S. v. Dep't of Human Servs., Div. of Youth & Fam. Servs., 157 N.J. 161, 178 (1999). The phrase "refers to conduct that is grossly or wantonly negligent, but not necessarily intentional." Ibid. Although it "implies more than simple negligence, it can apply to situations ranging from 'slight inadvertence to malicious purpose to inflict injury.'" Ibid. (quoting McLaughlin v. Rova Farms, Inc., 56 N.J. 288, 305 (1970)). "Essentially, the concept of willful and wanton

10

misconduct implies that a person has acted with reckless disregard for the safety of others." Id. at 179. A court deciding if a parent acted without a minimum degree of care must consider "the dangers and risks associated with the situation." Id. at 181-82. Put another way, the "inquiry should focus on the harm to the child and whether that harm could have been prevented had the guardian performed some act to remedy the situation or remove the danger." Id. at 182.

The statute involves a two-step analysis: first, determining whether the parent's conduct was grossly negligent or reckless; and then, whether the conduct caused a risk of imminent harm. See Dept. of Child. and Fam. v. E.D.-O., 223 N.J. 166, 182-83 (2015) (noting that the second step need not be reached if the first is not satisfied).

The facts here support the court's conclusion that Emily failed to exercise a minimum degree of care, placing the children's physical condition at imminent risk of harm (the court having decided not to reach the issue of the children's mental or emotion condition). Emily was evidently in the throes of a mental health crisis. However, the heart of the court's inquiry is not a parent's culpability (or lack of it), but the children's protection. Id. at 178. Twice, Emily drew David out of the car, leaving the children alone while they observed the

frightening scenes of their mother first threatening to jump off an overpass, and then racing across the Turnpike to the median and then back again, narrowly avoiding oncoming traffic. Urging their mother to stop, the children could have defied David's order to stay put and tried to intervene, thereby endangering themselves. In particular, almost-ten-year-old Karen could have unbuckled herself and then her brother, and then the two could have run after their parents, either on the highway shoulder or across the traffic lanes. And while the children stayed in the car by the side of the road, they remained at risk of a passing vehicle side-swiping the parked car.

This was not a case of a parent leaving children unattended briefly in the safety of a locked car in front of a local store. See Dept. of Child. & Fam. v. G.R., 435 N.J. Super. 392, 399 (App. Div. 2014) (reviewing facts relevant to neglect determination, including the time the parent was away, the distance between the parent and child, whether the parent lost sight of the child and for how long, and other extenuating circumstances). The trial court here considered the exceptional hazards presented when children were left unattended on the side of the Turnpike at night, while their mother behaved in a way that threatened to draw them out of the vehicle and incur even greater danger. Emily also risked

harm to the children and everyone else in the car, when she repeatedly struck David while he was driving.

An "ordinary reasonable person would understand" that Emily's behavior "pose[d] dangerous risks" to the children. G.S., 157 N.J. at 179. Because Emily "act[ed] without regard for the potentially serious consequences, the law holds [her] responsible." Ibid. The trial court thus had sufficient evidence to find Emily failed to exercise a minimum degree of care.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION