# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1536-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

A.H.,

     Defendant-Appellant,

and

M.G.,

     Defendant.

_____

IN THE MATTER OF K.H., a minor.

_____

Submitted March 8, 2021 – Decided April 27, 2021

Before Judges Currier and Gooden Brown.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FN-12-0180-18.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn Veasey, Deputy Public Defender, of counsel; Beth Anne Hahn, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jane C. Schuster, Assistant Attorney General, of counsel; Michael A. Thompson, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (David Valentin, Assistant Deputy Public Defender, on the brief).

PER CURIAM

Defendant A.H. (Arthur)[1] appeals from the October 29, 2018 Family Part order finding he abused and neglected his seven-year-old daughter, K.H. (Katie), under N.J.S.A. 9:6-8.21 by using illicit drugs in her presence and leaving her alone in the middle of the night in an unlocked apartment while he went to purchase heroin. We affirm.

Defendant M.G. (Mary)[2] is Katie's mother. At the time of these events, Arthur and Mary were living together.

---

[1] We use initials and pseudonyms to protect the child's privacy. R. 1:38-3(d)(12).

[2] Mary has not appealed from the court order finding she abused and neglected Katie within the meaning of Title Nine.

At approximately 3:30 a.m. on March 30, 2018, Milltown police officer Sergeant James Mioduszewski pulled over a taxicab for a motor vehicle violation. Arthur and Mary were passengers in the cab. During the fact-finding hearing, Mioduszewski testified that he observed drug paraphernalia in the back seat of the cab next to Arthur. Although Arthur denied owning the paraphernalia, he told the officer he had some other narcotics in his possession, specifically two glassine folds containing heroin and a "personal [] amount" of crack cocaine. Arthur and Mary were subsequently arrested.

Mioduszewski was familiar with the couple and knew they had a daughter. When he asked about Katie's whereabouts, Mary told the officer that a woman who lived in the apartment next door was watching her. Mioduszewski then "went to [the neighbor's apartment], pounded on the door, [and] rang the doorbell . . . to ensure that the daughter was safe." Nobody answered the door.

Mioduszewski then went to Mary's apartment to check on Katie. As the front door was unlocked, he walked into the apartment and found the child asleep in a bed. He testified that he also observed four pills laying on a coffee table.[3] The New Jersey Division of Child Protection and Permanency (the Division) assumed custody of Katie that night and placed her with relatives.

---

[3] The pills were later identified as an over-the-counter pain reliever.

Division investigators interviewed Mary on March 30, 2018 and on April 2, 2018. Mary stated that on the evening prior to these events, Katie had gone to bed around 8:30 or 9:00 p.m. Thereafter, Mary asked her neighbor, Josie, to watch Katie while Mary and Arthur took a taxicab to the next town to buy and use heroin. Mary said she returned home at approximately 10:30 p.m.

Later, at approximately 2:30 a.m., Mary and Arthur left the apartment again to buy crack cocaine. Mary said she texted Josie telling her that she was leaving the apartment and asking her to watch Katie. Mary stated she never left Katie at home without adult supervision. She admitted to the caseworker that she was a heroin addict and she and Arthur had been using heroin daily since 2017.

The Division also interviewed Arthur on March 30, 2018. He told the investigator Katie had gone to bed around 8:30 or 9:00 p.m. the night of these events. According to Arthur, he and Mary went to his uncle's house in the next town around 11:30 p.m. He said he observed Mary speak with Josie before the couple left, asking her to check in on their daughter. He did not know if Josie had a key to the apartment.

Arthur denied using any drugs that evening. He acknowledged to previously spending time in prison for possession of controlled dangerous

A-1536-19

substances, and, although he was sober for a period of time after his release in 2010, he stated he relapsed in 2018.

On April 2, 2018, Division caseworker Denise Purdue interviewed Katie. She told Purdue she lived in her mother's apartment with her parents, and she felt "a little safe" living with them. She reported that she rarely ate three meals a day. While her school provided lunch, neither parent cooked dinner. Katie said she would make herself a sandwich, eat a snack, or go to bed hungry.

In discussing the events of March 30, Katie stated she did not know her parents had left the apartment that night. But she recalled one time when she woke up in the middle of the night and found her parents were not home. She said the house phone was not charged, and she could not call her parents because she did not know their cell phone numbers. She stated she was scared when she woke up and realized she was alone.

Katie told Purdue that her parents would bring spoons and a makeup box containing needles into the bathroom where they would stay for about half an hour. She said when her parents came out of the bathroom, Mary's voice was strained, and Arthur would fall asleep standing up. Katie said this behavior began in 2018. Mary confirmed that she and defendant would go into the bathroom each day to use heroin when Katie was home.

A-1536-19

Katie described to Purdue how her parents regularly took her to the next town where they would meet a "strange" man on the street and "exchang[e] things" with him. Because they often did not have cab fare to get back home, Katie would walk with her parents from the neighboring town back to their apartment. Mary confirmed Katie's statements.

Katie also stated that a man often came to the apartment and she and Arthur would hide in the attic while Mary spoke to the man. Katie said she also had a hiding spot outside. Katie thought Mary was trying to get money from the man because afterwards they would have enough money to take a taxi to the next town.

When the Division questioned Mary about these statements, she explained she and Arthur had a scam where they found men on Craigslist under the pretense of providing sexual services and invited them over to the apartment. She stated that when the men came over, Arthur and Katie would hide in the attic while Mary got money from the men before leaving the apartment through a different exit. Arthur would then come down and tell the men to leave.

The Division also interviewed Josie. She described Mary and Arthur as "dope addicts" and said she had seen Mary inject herself with heroin while Katie was home.

6

Josie recalled Mary asking her to watch Katie on March 29, 2018 sometime between 6:00 p.m. and 9:00 p.m., and that she waited with the child for about thirty minutes until her parents returned to the apartment. She could not recall if Mary asked her to watch Katie again later that night or in the early morning hours.

Josie stated that Mary and Arthur had a daily routine of taking cabs to the next town and asking her to watch Katie. She did not have a key to Mary's apartment. Josie also confirmed Mary had a scam where she invited men to her apartment, took money from them, and told them she had to go to the other room to get undressed. Mary would then exit the apartment and often go into Josie's apartment to wait for the men to leave. She stated Mary had performed this scam while Katie was home and she recalled Mary scamming four different men in a single day. On occasion, Mary and Katie would hide in Josie's apartment during and after the scam.

At the conclusion of the investigation, the Division found the allegations against Mary and Arthur for inadequate supervision, risk of harm, and exposing a child to substance abuse were substantiated. The Division's subsequent verified complaint and order to show cause for custody was granted.

A-1536-19

On September 28, 2018, Judge Stolte conducted a fact-finding hearing. Arthur and Mary were not present. When the court inquired as to their whereabouts, counsel replied that they did not have any information. Counsel did not request an adjournment. The Division presented two witnesses: Officer Mioduszewski and the Division caseworker, Purdue. The Milltown police report, the Division's screening summary, and its investigation report were admitted into evidence. Defendants did not present any witnesses.

On October 29, 2018, Judge Stolte issued a well-reasoned oral decision finding the Division had shown, by a preponderance of the evidence, that Arthur abused or neglected Katie by leaving her "home alone with the doors unlocked . . . specifically for the purchase of narcotics" and in caring for Katie while under the influence of illegal substances. The judge found both Mioduszewski and Purdue were credible witnesses, describing them as "forthright" and answering questions directly.

The judge further noted that the evidence was largely undisputed. She stated it was clear that Arthur left Katie "home alone with the doors unlocked with no certainty that [Josie] or any other adult would be caring for [his] child in [his] absence. [He] left [his] [seven]-year-old daughter home unattended in the middle of the night."

8

Indisputably, those actions alone placed Katie at risk. However, Judge Stolte also found that Arthur put Katie at an even higher level of risk when he and Mary perpetrated a scam on numerous men, creating a dangerous environment for her. Based on these facts, the court found defendant "did not take a proper measure to remove any potential harm or danger that could come to [Katie] . . . and [his] actions were grossly negligent."

The court distinguished the circumstances presented here from cases where children were left alone and unsupervised due to an honest mistake made by their parents. Here, Arthur intentionally left Katie alone in the middle of the night with no ability to watch over her or ensure her safety. Arthur did not confirm whether anyone would be checking on Katie and his "conduct did not appear to consider the possible repercussions of leaving [Katie] unsupervised or alone in the home in the middle of the night with unlocked doors."

The court also determined that Arthur disregarded the substantial risk of harm his drug use posed to Katie. As Arthur was arrested with drugs and drug paraphernalia in his possession, the court found it reasonable to infer that, had he not been arrested, he would have returned home with those substances, and placed Katie in "imminent danger."

A-1536-19

The court also noted that pills were found "laying in [] plain view" in the home and that Katie "could have accidentally consumed one of them and . . . could have suffered harm as a result." The court further stated that Katie was very aware of where her parents kept their needles and spoons and could have easily gained access to them, thereby creating a substantial risk of harm or danger of impairment. Katie had observed Arthur disappearing into the bathroom with a box of needles for half an hour on numerous occasions and observed him sleeping while standing when he came out.

Judge Stolte concluded that Arthur left Katie unattended on the night of March 30, 2018, and frequently exposed her to his substance abuse while in a caregiving role, which conduct demonstrated a failure to exercise a minimum degree of care. Therefore, the Division had established Arthur had abused and neglected his daughter within the meaning of N.J.S.A. 9:6-8.21(c).

On appeal, Arthur contends the court erred in finding he abused or neglected Katie because he was not her primary custodial parent or caretaker and Mary was responsible for all childcare and day-to-day decisions. He further asserts that even if he was a primary caretaker, the Division did not produce sufficient credible evidence establishing he inadequately supervised Katie or exposed her to an imminent risk of substantial harm. Arthur argues the court

10

improperly supported its decision with Katie's out-of-court statements, which lacked the requisite corroboration. Arthur also contends his due process rights were violated when the trial proceeded in his absence.

Our review of a trial court's fact-finding decision is limited. "Because of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding." Cesare v. Cesare, 154 N.J. 394, 413 (1998). Factual findings are upheld "when supported by adequate, substantial, and credible evidence"; however, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." N.J. Div. of Youth and Family Servs. v. R.G. & J.G., 217 N.J. 527, 552-53 (2014) (quoting N.J. Div. of Youth and Family Servs. v. E.P., 196 N.J. 88, 104 (2008) and Manalapan Realty L.P. v. Twp. Comm. of Twp. of Manalapan, 140 N.J. 366, 378 (1995)).

We initially briefly address Arthur's contention that he was not accorded his due process rights. He asserts he was not present at the fact-finding hearing because he was incarcerated at the time. However, he has not provided any proof of his confinement.[4]

---

[4] Arthur was present at a compliance hearing in August 2018. During the hearing, the Division advised the court that Arthur was "briefly incarcerated

Even if Arthur was detained, the Family Court conducted the fact-finding hearing according to the proper statutory procedures. The court ensured defendant was represented by counsel. The judge inquired where defendant was, to which counsel replied, "I don't have any information. . . ." The court also confirmed that everyone was ready. Prior to starting trial, the judge indicated she was willing to hear any requests or pretrial motions before proceeding. There were no applications. Arthur's counsel did not request an adjournment at any time.

Although Arthur was not present, his counsel fully participated in the trial. She cross-examined the Division's witnesses, objected to evidence, and presented a closing argument. Therefore, Arthur was afforded his due process rights and presented his case through counsel.

We discern no merit in Arthur's contention that the Family Court erred in finding he abused or neglected Katie. Under N.J.S.A. 9:6-8.21(c)(4)(b), a child is considered abused or neglected if the child's:

> physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of [the child's] parent or guardian, as herein defined, to exercise a

from June [11] to June [26] on CDS charges." Arthur's counsel informed the court that the charges arose from the March arrest. The court set the fact-finding hearing date during this proceeding.

12

> minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof. . . .
>
> [N.J.S.A. 9:6-8.21(c)(4)(b).]

The court must determine what constitutes "a minimum degree of care" under the particular circumstances. G.S. v. Dep't of Human Servs., Div. of Youth and Family Servs., 157 N.J. 161, 181-82 (1999). "[A] guardian fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." Id. at 181. "[M]inimum degree of care" refers to conduct that is "grossly or wantonly, negligent, but not necessarily intentional." Id. at 178.

There is no intent required to find abuse. Ibid. If a guardian's act or omission does not meet the "minimum degree of care" required by law, the substantiated finding must stand. Ibid. "Where an ordinary reasonable person would understand that a situation poses dangerous risks and acts without regard for the potentially serious consequences, the law holds him responsible for the injuries he causes." Id. at 179. Knowledge is imputed to the actor. Id. at 178; see also N.J. Div. of Youth & Family Servs. v. T.B., 207 N.J. 294, 306-09 (2011) (reaffirming the G.S. test).

Our Supreme Court has held that the Division can sustain a Title Nine action by proving that a child suffered actual harm or was placed in imminent risk of harm because of parental action or inaction. N.J. Dep't of Children & Families v. A.L., 213 N.J. 1, 23 (2013). However, not every instance of drug use by a parent will be sufficient to sustain a finding of abuse or neglect. See N.J. Div. of Youth & Family Servs. v. V.T., 423 N.J. Super. 320, 331 (App. Div. 2011).

Because Arthur asserts for the first time that he was not Katie's primary custodian or caretaker, we first address this argument before proceeding to a consideration of whether he failed to exercise a minimum degree of care in properly supervising his daughter.

Arthur's contention is meritless. Under Title Nine, a parent or guardian is "any natural parent . . . who has assumed responsibility for the care, custody, or control of a child or upon whom there is a legal duty for such care." N.J.S.A. 9:6-8.21(a). In addition to being Katie's biological father, Arthur was residing with her at the time of these events. Moreover, Arthur told the Division investigator that on March 29, he took Katie to school, later picked her up with Mary, and then they went to the grocery store. After they got back to the apartment, Arthur said Mary made dinner and all three of them played a board

14

game. Defendant told the investigator it was a "normal day" and "nothing was out of the ordinary."

Arthur's description of his relationship with Katie was that of a parent or guardian. In addition, he was the child's biological father and was living with her and the child's mother for at least several months before these events. He has not demonstrated he does not meet Title Nine's broad definition of parent or guardian.

We also are unpersuaded by Arthur's assertion that the Division did not meet its burden to present competent, material, and relevant evidence that Arthur inadequately supervised Katie. Here, there was ample evidence that Arthur failed to exercise a minimum degree of care. He left Katie alone in an unlocked home in the middle of the night. When Arthur left at 2:30 a.m., he made no arrangements for anyone to care for his seven-year-old daughter or to ensure her safety.

When Mioduszewski arrived at the apartment to check on Katie, he found her sleeping in the unlocked apartment with no adult present. There were loose pills on the coffee table. Katie told the Division caseworker that her mother kept needles in her makeup box. Moreover, Katie had awakened on an earlier

15

occasion in the middle of the night to find she was alone in the apartment which scared her.

There was more than ample evidence that Arthur's conduct recklessly and wantonly created a risk of serious harm by leaving Katie home alone in the middle of the night in an unlocked apartment when he left to purchase drugs.

In addition, Judge Stolte's determination that Arthur's use of heroin in the home while Katie was present created an imminent risk of harm was supported by sufficient evidence in the record. When police stopped the taxicab in which Arthur was riding, the officer observed drug paraphernalia on the seat beside Arthur. He had heroin and crack cocaine on his person. As the judge noted, if the cab had not been stopped, Arthur would have returned to the apartment and exposed Katie to the drugs.

Moreover, Katie told the Division investigator that her parents would go into the bathroom with needles and spoons and come out a half hour later. Afterwards, her mother's voice was strained and Arthur fell asleep while standing up. Mary corroborated Katie's account, stating she and Arthur would use heroin in the bathroom while Katie was home. She also said she and Arthur used heroin daily.

A-1536-19

Katie was put in an imminent risk of harm by being left alone. Arthur's substance abuse contributed to the risk of harm because he left Katie home alone in the middle of the night in an unlocked apartment to go to the next town to purchase heroin. In addition, the presence of drugs and drug paraphernalia in the home also created a substantial risk of injury to the child.

We turn next to Arthur's contention that the Family Part improperly supported its findings wholly on Katie's uncorroborated hearsay statements. We disagree.

Hearsay is defined as a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. N.J.R.E. 801(c). "Hearsay is not admissible except as provided by [the Rules of Evidence] or by other law." N.J.R.E. 802.

Under N.J.S.A. 9.6-8.46(a)(4), "previous statements made by the child relating to any allegations of abuse or neglect shall be admissible in evidence; provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact finding of abuse or neglect."

A finding of abuse or neglect "must be based on competent reliable evidence." N.J. Div. of Youth and Family Servs. v. L.A., 357 N.J. Super. 155, 166 (App. Div. 2003). Although "[t]he most effective types of corroborative

evidence may be eyewitness testimony, a confession, an admission[,] medical or scientific evidence", it "need only provide support for the out-of-court statements." Ibid. (quoting N.J. Div. of Youth & Family Servs. v. Z.P.R., 351 N.J. Super. 427, 436 (App. Div. 2002)). "[C]orroborative evidence need not directly relate to the accused." Ibid.

During the fact-finding hearing, the court admitted the Division's investigation report into evidence under the business records exception, N.J.R.E. 803(c)(6). The report contained the interviews that the Division conducted with Arthur, Mary, Katie, and Josie. Purdue, the Division caseworker, also testified at the hearing.

In her decision, Judge Stolte made it clear that she found statements made by Katie to the Division caseworker that were corroborated by Mary were admissible. She did not rely on any statements Mary made about Arthur's words or actions as she found they were hearsay.

However, the court did not need any corroborative evidence to find Katie was left home alone on March 30, 2018. Mioduszewski testified regarding his own observations. When he arrived at the apartment at approximately 4:00 a.m., he found Katie in an unlocked apartment without any adult supervision. The

officer's testimony provides ample support for the court's finding that Arthur inadequately supervised his child.

Purdue's interview of Mary corroborated Katie's statements concerning Arthur's substance abuse and supported the court's finding that Arthur's drug abuse exposed Katie to an imminent risk of harm. Katie said her parents both went into the bathroom with spoons and a makeup box containing needles. She said when they came out after a half hour, her parents sounded and acted strangely. The child said the behavior began in 2018. Mary confirmed this behavior in her interview, stating she and defendant went into the bathroom when Katie was home to use heroin on a daily basis. Arthur himself stated he relapsed in 2018.

Katie also described for the investigator her parent's daily trips to the next town and their "exchang[es]" with a man on the street. Mary said she and Arthur took Katie to purchase drugs and they usually walked home because they did not have enough money for a cab.

Katie's reports about her mother's scams to get money from unwitting strangers was also corroborated by Mary and Josie. Although Mary's interview does implicate Arthur, her statements describe her actions and observations. She did not report nor did the judge rely on any statements Mary attributed to Arthur.

A-1536-19

Mary's and Josie's interviews sufficiently corroborated Katie's statements and support a finding of abuse and neglect as defined under Title Nine.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1536-19